# Exhibit B

**From:**
**To:**
**Subject:**

**From:**

**To:**
**Subject:**

---------- Forwarded message ---------
From: **Joshua Fineman (BLOOMBERG/ NEWSROOM:)** <jfineman@bloomberg.net>
Date: Tue, Aug 22, 2017 at 8:18 AM
Subject: Re:Fwd: Fresenius/NxStage: Hemodialysis Machine Overlap, Negative Customer Reaction, Lack of Clear Fix, Drive Antitrust Risk
To:

```
tks

From:                              At: 08/22/17 11:17:39
To:  JO                G/ NEWSROOM: )
Subject: Fwd: Fresenius/NxStage: Hemodialysis Machine Overlap, Negative
Customer Reaction, Lack of Clear Fix, Drive Antitrust Risk
```

---------- Forwarded message ----------
From: **The Capitol Forum** <editorial@thecapitolforum.com>
Date: Tue, Aug 22, 2017 at 8:00 AM
Subject: Fresenius/NxStage: Hemodialysis Machine Overlap, Negative Customer Reaction, Lack of Clear Fix, Drive Antitrust Risk
To:

**Web Version** | **Update preferences** | **Unsubscribe**



### Fresenius/NxStage: Hemodialysis Machine Overlap, Negative Customer Reaction, Lack of Clear Fix, Drive Antitrust Risk

*Vol. 5 No. 284 - August 22, 2017 -* ***[Click here]*** *to access our library.*

**Deal Update**

On August 7, 2017, Fresenius Medical Care announced an agreement to acquire NxStage Medical, Inc. in an all-cash transaction valued at about $2 billion.

NxStage and Fresenius market the only two hemodialysis machines FDA-approved for home use, and interviewed dialysis provider customers express concern about the combination's impact on competition. Although the parties may contend that the Fresenius product is a competitively insignificant, distant substitute for the NxStage machine, or that entry would address competitive issues, these arguments will each face obstacles.

The transaction may also raise concerns in the broader market for hemodialysis machines, where Fresenius occupies a dominant position in-clinic. Although NxStage's share of an all-machine market is small, the company projects that home hemodialysis adoption will grow substantially. And because this growth would come primarily at Fresenius' expense, current shares may understate NxStage's future competitive significance and competitive interaction with Fresenius.

If the FTC views the deal as lessening competition in an all-hemodialysis machine market, the deal is effectively unfixable. Even a remedy to address overlap in the narrowly defined home hemodialysis machine market—presumably involving divestiture of the Fresenius 2008K@Home machine (the "Baby K")—would encounter logistical, commercial, and competitive roadblocks.

Ultimately, given structural issues in multiple relevant product markets, negative customer reaction, and a lack of a clear fix, the Fresenius/NxStage deal faces at least moderate antitrust risk.

"We are confident that [the transaction] would be procompetitive for consumers and patients," a Fresenius Medical Care spokesperson says. NxStage did not respond to a request for comment.

**In-depth: Home Hemodialysis Machine Market**

**In-center hemodialysis, peritoneal dialysis, and home hemodialysis.** Patients with end-stage renal disease (ESRD), or kidney failure, generally opt to pursue **dialysis treatment**—a typically thrice-weekly process through which a dialysis machine effectively serves as an artificial kidney.

Of the approximately 470,000 Americans currently in dialysis treatment, roughly 88% opt for in-center hemodialysis. The remaining 12% choose a home therapy—10% opt for peritoneal dialysis and 2% for home hemodialysis. Although the home hemodialysis population has grown from 0.8% of all patients in 2006, the segment remains relatively small, including fewer than 10,000 Americans.

NxStage, nonetheless, **estimates** the global home hemodialysis market at about $300 million. Despite education and reimbursement hurdles, NxStage investor materials project a 10 to 15% home hemo penetration target and an eventual market size exceeding $1 billion.

**Fresenius and NxStage market only two hemodialysis machines FDA-approved for home use.** Fresenius (2008K@Home) and NxStage (System One) manufacture and market the only two hemodialysis machines FDA-approved for use in the home setting. "For home hemo, your options are the Fresenius Baby K or the NxStage machine—they own the market," explains Richard Tagliagambe, director of purchasing at Atlantic Dialysis Management.

NxStage is the clear market leader in home hemodialysis. "NxStage probably makes up 80%, 85% of the market in the United States because it's much easier, portable, lighter—it favors patients to go home," says Robert Lockridge Jr., a former Medical Director of the University of Virginia's Lynchburg Dialysis Facility, and dialysis machine expert. Fresenius' 2008K@Home occupies the remainder of the home market. In the company's 2016 annual report, Fresenius indicates that about 22% of home hemodialysis patients worldwide use Fresenius products. However, this number may overstate Fresenius' share in the U.S. market, where, according to one industry source, the Baby K occupies just a single-digit share.

**Home hemodialysis machines are very likely a relevant product market.** Home hemodialysis machines lack any clear substitute and are very likely a relevant product market.

Although the majority of home dialysis involves peritoneal dialysis, PD is a fundamentally different form of treatment than hemodialysis, typically available to patients with some residual kidney function. As evidenced by the 90% hemodialysis adoption rate, PD is oftentimes a poor option and is a relatively short-term fix in many cases. In evaluating the issue in 2013 (Baxter/Gambro), the EC **concluded** that "a small but significant increase in the price of HD products would be unlikely to induce a significant number of customers to switch to PD to treat chronic patients, and vice-versa."

In-clinic hemodialysis machines are likewise poor options for home hemodialysis, due to size, resource usage, and lack of FDA indication for home use. In fact, interviewed industry sources do not report any home use of machines not FDA indicated for the home setting. "There are a lot of regulatory, medical, legal reasons that you wouldn't do that—you wouldn't use something that doesn't have approval," says a Chief Medical Officer of a mid-sized U.S. dialysis provider.

Put simply, a hypothetical monopolist of home hemodialysis machines could very likely raise prices profitably without substantial diversion to peritoneal dialysis or in-clinic hemodialysis machines. The

Fresenius/NxStage combination, then, may be an effective merger to monopoly in what is very likely a valid product market.

**Some negative customer reaction.** Given this market structure, some interviewed dialysis provider customers express broadly negative views of the transaction's competitive implications.

"It would be a concern for me," says Atlantic Dialysis' Richard Tagliagambe. "If one company literally dominates the entire market it makes it a little bit more difficult from a provider standpoint to keep that profit margin consistent," Tagliagambe adds.

To be clear, dialysis providers occupy an unusual position, as both customers of, and competitors to, Fresenius, which treats about 38% of U.S. dialysis patients. In fact, Fresenius' market-leading position in both machines and services could exacerbate competitive issues, as a post-merger price increase on home hemodialysis machines would benefit both the company's products segment and —by raising its dialysis provider rivals' costs—its services segment as well.

"I foresee them using this as an added advantage over the competitor," says Tagliagambe. "Those are the only two technologies, so if I'm Fresenius and I own it all and now I'm DaVita and I want to bring a patient to home dialysis, you'll need to be very creative in your approach as it opens the opportunity to drive contracts to a premium," Tagliagambe adds.

The CMO of the mid-sized U.S. dialysis provider likewise expresses concerns about the transaction. "You have two organizations that corner a market, so that's absolutely a concern as you move forward," says the CMO. "You want to make sure that there is reasonable capacity and somebody hasn't cornered the market on a product," the CMO adds.

To be clear, customer reaction to the transaction has not been universally negative. For example, on an August 9 earnings call, American Renal Associates CEO Joseph A. Carlucci said: "With regard to the transaction, I think that it might be actually good for the industry, because in my view, at least, it will—NxStage has always done a good job. We use NxStage machines for sure. But with Fresenius, I would hope that there's more capacity in the manufacturing area, which potentially could lead to better pricing in the future."

**Competitive effects: parties may argue that machines do not compete closely, Baby K competitively insignificant.** To overcome market structure and customer reaction issues, the parties will presumably rely on two arguments: competitive effects and entry.

On effects, the parties will likely argue—with some basis in fact—that although the System One and 2008K@Home are the only two hemodialysis machines FDA-approved for home use, the Fresenius 2008K@Home occupies a competitively insignificant market position, and is generally a distant substitute for the NxStage product.

Fundamentally, the Baby K is simply a slightly modified version of Fresenius' in-center 2008K² machine. The NxStage System One, by contrast, is much smaller, and sufficiently portable that home dialysis patients may travel with the device. "The technology is totally different. One is an in-center machine, made into a home machine, one is a machine that was designed totally for home dialysis," says Lockridge.

Portability issues aside, the Baby K uses bicarbonate dialysate, which requires a water treatment system and certain plumbing and electrical modifications to the home. The NxStage, by contrast, uses lactate dialysate and requires only a grounded electrical outlet, or connection to a water source and hose.

As a result, clinics and patients—including Fresenius clinic patients—largely choose the System One. And given the 2008K@Home's drawbacks, the parties may argue that the Baby K, despite its home indication, is competitively insignificant in the home market. "85% of the patients that are on home dialysis today in the Fresenius-owned patients, they're using NxStage. So that tells you right there—the people that own the machine are not even selling it or using it," Lockridge adds.

Fundamentally, the Fresenius machine occupies a relatively minor position in the home hemodialysis market. In that same respect, Fresenius continues to market the Baby K, including to non-Fresenius providers. Customer reaction is largely inconsistent with the idea that the combination would not diminish competition. And more generally, the argument that the only two products in a product market do not actually compete, or otherwise constrain one another's pricing—although plausible—is typically an uphill climb.

**Entry plausible, but timeliness, likeliness unclear.** The parties may also argue that entry to the home hemodialysis machine market would alleviate potential adverse competitive effects.

In the near-term, the most likely entrant to the home market is Outset Medical's Tablo, which is FDA-approved for clinic and hospital settings and currently in an IDE trial, seeking FDA clearance for a home indication. Outset has attracted significant funding from Warburg Pincus and others, and the Tablo is viewed as a much closer potential competitor to NxStage's System One than is the Fresenius 2008K@Home. Industry sources offer varying projections on timing for Tablo's potential entry to the market, with late 2018 viewed as the earliest window, and 2019 relatively more likely.

A second potential entrant is Quanta Dialysis Technologies, which in January 2015 won a CE mark (EU) for its SC+ product in the home setting. Although the SC+ is currently in commercial use in the United Kingdom, and the EU approval could expedite the FDA process, the company does not appear to have publicly announced, or taken concrete steps toward, U.S. entry. Quanta's entry in the U.S. market, even with the benefit of a CE mark, would likely be a two-year proposition, at least.

In a highly regulated industry with unclear commercial prospects, however, entry is never a fait accompli—even with the benefit of ex-U.S. regulatory approval or ongoing U.S. clinical trials. Baxter, for example, won a CE mark for its Vivia home hemodialysis machine in December 2013, and it began U.S. clinical trials on the product in March 2016. Just three months later, however, the company **announced** that it would abandon U.S. entry and exit the European market, given reliability and cash flow issues.

Ultimately, entry to the home hemodialysis market is high risk, and, as the Baxter situation demonstrates, an uncertain proposition. And from a timing perspective, 2019 appears to be the most likely timeframe for new entry—well after the instant transaction is expected to close, and potentially insufficiently timely to counteract any increase in post-merger market power.

**Given Fresenius' dominant share, potential NxStage growth, deal may raise issues in an all dialysis machine market.** Home issues aside, the merger may also raise issues in a more broadly-defined, all-dialysis machine market.

Fresenius is dominant in the U.S. market, manufacturing more than 84% of dialysis machines **sold** in 2016—a slight downtick from reported 93% **shares** in 2015 and 2014. The company's 2008 series is currently the leading U.S. dialysis system, with more than 129,000 units in use in 2016.

Hemodialysis machines for chronic ESRD patients, including in-center and home, may also constitute a valid product market. The machines lack any real substitute (including peritoneal dialysis machines), and a hypothetical monopolist of such machines could very likely raise prices profitably.

To be clear, the NxStage System One, primarily used in-home, and the Fresenius 2008T and 2008K², used mainly in-center, may not compete closely head-to-head. However, as NxStage works towards shifting 10 to 15% of U.S. dialysis patients to home hemodialysis, almost all that growth would come at an in-center's expense. And because Fresenius is dominant in-center, almost all of NxStage's expansion would come at Fresenius machines' expense. Furthermore, even if the machines are not close substitutes, the Fresenius 2008 series—the clear market leader in-center—and the NxStage System One—the clear market leader in-home—may compete on quality and innovation dimensions, geared at convincing doctors and patients to choose the modality, and clinics to ultimately purchase the machines.

In an all-hemodialysis machine market, Fresenius reports an 84% 2016 U.S. share. Assuming NxStage's share of all machines is 1.6% (80% of the 2% home hemodialysis market), combining the

two firms will increase HHI  roughly 270 points—a substantial concentration increase in an already highly concentrated market. However, because Fresenius benefits from a captive market for its machines at its centers, the relevant market may involve sales only to non-Fresenius providers, in which case the deal may increase an all-dialysis machine market HHI by between 100 and 200 points.

Importantly, to the extent the company's projections of a 10 to 15% home hemodialysis adoption rate prove accurate, NxStage's current share will understate the company's future competitive significance, and interaction with Fresenius. Despite a relatively small increase in current market concentration, a dominant player in machines and services acquiring a disruptive, potentially maverick competitor is a scenario that may raise FTC concerns.

**Fix would face certain logistical, commercial, competitive roadblocks.** If the FTC concludes that the transaction would lessen competition in an all-hemodialysis machine market, the problem is not amenable to a structural fix. The System One generated about 74% of NxStage's revenue in 2015, and the unit's sale would almost certainly eliminate Fresenius' rationale for pursuing the deal.

Fresenius' North American dialysis products segment generated $904 million in 2016 revenue. Although this segment includes non-machine products such as dialyzers, solutions, and drugs, divesting a significant portion of a $904 million business in order to acquire a company with $366 million in revenue is, from Fresenius' perspective, almost certainly a poor trade.

Even in the event that only the home hemodialysis machine market is an issue, a divestiture solution may prove complicated. To be clear, the 2008K@Home is in limited usage, faces limited growth prospects, and is, in and of itself, a sufficiently small percentage of Fresenius' products segment that divesting the machine would have little to no impact on the deal rationale.

Logistically, however, it is not clear that Fresenius could easily divest the Baby K. Fresenius' 2008 series includes three models: the 2008T, the 2008K$^2$, and the 2008K@Home. The Baby K, however, is effectively the exact same machine as its larger counterparts. "It's an identical version, only thing that's different is it's literally shorter—that's it," says Tagliagambe, adding "literally piece for piece each component is identical." "The platform for the Fresenius Baby K is really a 2008K machine—it's dressed up, but it's the same machine," adds Lockridge.

Put differently, not only is the 2008K@Home not a demonstrably autonomous, easily segregable business unit, but from manufacturing, marketing, and maintenance perspectives, it is not clear that Fresenius could actually divest the model, while leaving the rest of its 2008 series line untouched. Attracting a buyer that would restore price, quality, and innovation competition in the home market, while, by virtue of acquiring the platform, manufacturing, and technology related to the 2008K@Home, not enter into very direct competition with Fresenius in the in-clinic market, could prove difficult. This is especially the case given that Fresenius may argue during the review's early stages that the 2008K@Home is competitively insignificant, raising questions around whether and how a divestiture buyer could realistically present a viable business plan to acquire and compete effectively with the product post-acquisition.

To be clear, the 2008K@Home business is relatively marginal, and its divestiture could, in theory, both restore competition and maintain deal rationale. In practice, however, logistical, commercial, and competitive obstacles may complicate any fix—especially with an FTC that has grown increasingly skeptical of creative, high-risk settlement proposals and that views competitive issues in health care markets as warranting the strictest possible scrutiny.

**Merger agreement's litigation carve-out places reliance on substantial break fee.** At the end of the day, market structure and concentration issues, coupled with barriers to a structural fix, mean that the Fresenius/NxStage deal faces at least moderate antitrust risk. And the merger agreement's terms may exacerbate this risk even further.

The **agreement**, although obligating both parties to use reasonable best efforts to obtain antitrust clearance, provides an explicit litigation carve-out, stating that: "In no event shall the Parent [Fresenius] be obligated to (i) litigate against a Governmental Entity." Given structural and remedy

issues around the deal, this language may signal that in the event of an FTC full-stop challenge, the parties are unlikely to put the agency to its proof in court.

That said, the agreement does provide for a $100 million reverse termination fee, payable in the event the parties are unable to obtain antitrust clearance by the August 7, 2018 end date. This above-market reverse break fee, although indicating that the seller views the transaction as high-risk, does provide Fresenius an additional incentive to win clearance.

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

© 2017 by The Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum. Recipients shall not directly or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum. Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

Edit your subscription | Unsubscribe

1233 20th St. NW
Washington, DC, 20036
202.601.2300

**From:** ███████
**To:** ███████
**Subject:** ███████

---

**From:** ███████████████
███ ███████████████
**To:** ███████████████████
**Subject:** ███████████████████████
███████

---------- Forwarded message ---------
From: **Joshua Fineman (BLOOMBERG/ NEWSROOM:)** <jfineman@bloomberg.net>
Date: Wed, Nov 8, 2017 at 1:14 PM
Subject: Re:Fwd: AT&T/Time Warner: DOJ Demands CNN Sell-Off, Potentially Forcing AT&T Decision in Next Several Weeks
To: ████████████████

```
tks
```
..........................................................................................

To contact me please call 212-617-8953 work 917-402-6904 cell

```
From:   ████████████      At: 11/08/17 16:11:05
To:  JO██████████████G/ NEWSROOM: )
Subject: Fwd: AT&T/Time Warner: DOJ Demands CNN Sell-Off, Potentially
Forcing AT&T Decision in Next Several Weeks
```

---------- Forwarded message ----------
From: **The Capitol Forum** <editorial@thecapitolforum.com>
Date: Wed, Nov 8, 2017 at 12:40 PM
Subject: AT&T/Time Warner: DOJ Demands CNN Sell-Off, Potentially Forcing AT&T Decision in Next Several Weeks
To: ████████████████████████

**Web Version** | **Update preferences** | **Unsubscribe**



## AT&T/Time Warner: DOJ Demands CNN Sell-Off, Potentially Forcing AT&T Decision in Next Several Weeks

*Vol. 5 No. 373 - November 8, 2017 - **Click here** to access our library.*

**DOJ Update**

The DOJ is demanding AT&T sell off CNN before clearing the Time Warner purchase, which could force AT&T to decide as soon as the next several weeks whether to agree to the divestiture or prepare to defend itself against a government lawsuit to block the deal, a source familiar with the matter said.

Negotiations between the DOJ and AT&T are fluid, and new developments could change the trajectory of the discussions and timing, the source said.

The DOJ's demand could raise concerns about the department's motivations in light of President Trump's threats to clamp down on media criticism of his administration, and his singling out of CNN's coverage as particularly unfair.

But in making the divestiture demand, new antitrust chief Makan Delrahim could be considering well-established antitrust theories of harm, such as input and customer foreclosure.

The political argument also could be more difficult to make if the DOJ, as CNBC originally reported, more broadly is demanding AT&T sell off Turner Broadcasting, which, in addition to CNN, includes TNT, TBS, Adult Swim and Turner Classic Movies. Turner contributed about $11.3 billion to Time Warner's total 2016 revenue of $29.3 billion.

Until recently, the DOJ in its discussions with AT&T had demanded primarily behavioral conditions to ensure AT&T's MVPD and wireless competitors could buy Time Warner programming on fair and **reasonable terms**.

But Delrahim said in a recent speech that he generally did not favor behavioral remedies because they required too much oversight from the DOJ.

The change in DOJ's demands has thrown off AT&T's schedule for consummating the transaction. AT&T CFO John Stephens reportedly told participants in a New York City financial conference Wednesday that the timing of the deal's closing, which the company had said would be done by year's end, is now "uncertain."

Although the DOJ usually addresses the antitrust harms of vertical mergers such as AT&T/Time Warner with conditions, DOJ negotiators and deal critics have criticized conditions imposed on Comcast/NBCUniversal in 2011 as ineffective, sources said.

Spokespeople for AT&T and the DOJ didn't immediately return requests for comment.

**In-depth: Input, Customer Foreclosure Theories of Harm Could Drive DOJ Divestiture Ask**

**Input foreclosure as key theory of harm.** Although the AT&T/Time Warner deal raises a host of vertical issues, perhaps the most straightforward theory of harm arising from the transaction involves input foreclosure, or the prospect that AT&T would withhold Turner content—including TNT, TBS, and CNN—from rival pay-TV distributors, or raise its MVPD rivals' costs for the content **post-merger.**

Although the Time Warner acquisition will clearly give AT&T the ability to withhold Time Warner content, the company's incentive to actually do so is a more complicated question. AT&T has agreed to pay roughly $85.4 billion for a Time Warner business that generates revenue primarily through MVPD distribution agreements and advertising sales, and withholding Turner content from willing buyers would substantially reduce the segment's revenue.

DOJ's ultimate consideration in assessing an input foreclosure strategy's likelihood, then, is whether AT&T would actually gain the incentive to withhold the Turner content from MVPD competitors—a function of AT&T's ability to recoup upstream losses through enhanced downstream, MVPD profits. Given the reported Turner ask, DOJ appears to have concluded that the acquisition would drive such incentives, which the Division may view as not amenable to a behavioral fix.

**Customer foreclosure as a second key theory of harm.** Although less likely to impact consumer prices in the near-term, customer foreclosure, through which AT&T could discriminate against Time Warner's upstream programming rivals in distribution post-merger, also represents a potential **competitive issue.**

In practice, customer foreclosure is input foreclosure's mirror image—rather than AT&T withholding from rival distributors a crucial input such as TNT, TBS, or HBO, a customer foreclosure strategy would involve AT&T excluding Time Warner's upstream (Fox, Viacom, etc.) competitors' access to AT&T's broadband, wireless, or MVPD customers in order to benefit its newly-acquired Time Warner content segment.

Customer foreclosure concerns would appear to explain DOJ's CNN ask. Unlike general entertainment programming, the cable news market is arguably highly concentrated, including just three important competitors—CNN, Fox News Channel, and MSNBC. The cable news networks offer a unique product—full-day programming sourced from the same material. And notably, unlike general entertainment programming, cable news faces no real threat from OVD competitors Netflix,

Hulu, or Amazon.

As a result, the cable news networks may be relatively close substitutes from both viewer and advertiser perspectives. This conclusion is to some extent borne out by demographics, where the cable news viewers (CNN (median age 61), MSNBC (63), Fox News (67)) skew substantially older than broadcast network (median age of 54), or broadcast/cable viewers (44.4). And from an advertisers' perspectives, the cable news networks may represent a unique platform for targeting an older audience, or, given viewership, certain issue or political advertisements.

Given these issues, AT&T's post-merger incentives to discriminate against unaffiliated programming may be most pronounced in cable news. This is especially the case given that MSNBC, a second cable news competitor, is owned by Comcast. In fact, well before Delrahim entered the division, DOJ staff was investigating whether AT&T's proposed Time Warner acquisition would heighten the potential for the merged company and Comcast to coordinate to harm content and video distribution rivals.

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

1200 18th St. NW
Washington, DC 20036
202-601-2300

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

© 2017 by The Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum. Recipients shall not directly or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum. Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

Edit your subscription | Unsubscribe

**From:** ██████
**To:**
**Subject:**

██

---

**From:** ████████████
██ ████████████
**To:** ████████████
**Subject:** ████████████████████
████████████

---------- Forwarded message ----------
From: ████████ ████████████
Date: Mon, Nov 13, 2017 at 1:13 PM
Subject: Fwd: AT&T/Time Warner: DOJ Criticized Comcast/NBCU Consent Decree as Ineffective Before Rejecting Parties' Behavioral Remedy Proposals
To: Joshua Fineman <jfineman@bloomberg.net>

---------- Forwarded message ----------
From: **The Capitol Forum** <editorial@thecapitolforum.com>
Date: Mon, Nov 13, 2017 at 12:55 PM
Subject: AT&T/Time Warner: DOJ Criticized Comcast/NBCU Consent Decree as Ineffective Before Rejecting Parties' Behavioral Remedy Proposals
To: ████████████████████

Web Version  |  Update preferences  |  Unsubscribe



## AT&T/Time Warner: DOJ Criticized Comcast/NBCU Consent Decree as Ineffective Before Rejecting Parties' Behavioral Remedy Proposals

*Vol. 5 No. 383 - November 13, 2017 - **Click here** to access our library.*

<u>DOJ Update</u>

DOJ leadership, in meetings with AT&T and Time Warner representatives, slammed the department's Comcast/NBCUniversal consent decree as ineffective and easily undercut, rejecting AT&T and Time Warner's call for a similar agreement to fix the government's problems with their deal, sources familiar with the matter said.

In the recent meetings, the DOJ said it is concerned Comcast could have violated the NBCU consent decree requirement that it not involve itself in video streaming service Hulu's operations, the sources said. The department's critical view of the 2011 settlement in part led new DOJ antitrust chief Makan Delrahim last week to demand divestitures instead of behavioral remedies from AT&T CEO Randall Stephenson, the sources said.

Deal supporters have pointed to Comcast/NBCU as the deal most analogous to AT&T/Time Warner and the transaction's consent decree as a proven check on Comcast's ability to harm rival MVPDs and content companies, urging a similar agreement for AT&T/Time Warner. But the DOJ's dismissal of the decree, and behavioral remedies generally, signals the difficulty AT&T faces in convincing the government to accept a settlement involving anything less than divestitures of Time Warner-owned Turner Broadcasting's cable networks.

The government has until around Thanksgiving, sources said, to decide whether to sue or accept a remedy addressing its concerns. Those include AT&T through the acquisition gaining the power to raise MVPD rivals' costs for Time Warner content, or coordinate with Comcast to obtain the best contract terms from competitors.

If the DOJ sues, the Comcast/NBCU consent decree could become the focus of a courtroom fight over the effectiveness of behavioral remedies, until recently the government's preferred method for fixing harms in vertical mergers. Delrahim in a speech last month said he favored divestitures over behavioral fixes and that the DOJ is reviewing 1,400 consent decrees the DOJ made with companies.

The DOJ has in the past accused AT&T of not hewing to merger-related consent decree conditions. In 2009, AT&T agreed to pay more than $2 million to settle department allegations that the company violated a consent decree and related court order regarding the purchase of Dobson Communications.

So far, the DOJ hasn't indicated an interest in moving against Comcast for any alleged violations, sources said, although President Trump as a candidate said he wanted to unravel the NBCU deal. The department could, if it chose, file a civil contempt action in federal court to stop any alleged violations. If the DOJ wanted to go further and demand harsher behavioral restrictions or even divestitures, it would likely have to file a separate case.

Through the years, Comcast has proclaimed the success of the NBCU decree, noting that industry players filed under arbitration only a handful of complaints against the company. Comcast's critics said so few complaints were filed because the arbitration system took too long to render a decision, prompting the DOJ to insist on a speedier arbitration system in an AT&T/Time Warner consent decree under discussion.

Spokespeople for the DOJ and AT&T declined to comment. Comcast did not immediately return requests for comment.

**Comcast violation alleged.** In 2013, executives from Comcast, 21st Century Fox, and Disney – Hulu's co-owners – allegedly discussed the video service's future, according to 2015 a Wall Street Journal article.  At a Sun Valley, Idaho, meeting, Comcast allegedly said it would help make Hulu a service nationally competitive with Netflix, potentially violating Comcast's promise to the DOJ to become a silent Hulu co-owner after the NBCU purchase.

Comcast's proposal persuaded the co-owners to call off the sale, according to the paper. A Comcast spokesperson at the time denied that the company violated the consent decree.

Distaste for Behavioral Fixes

In his first speech as the DOJ antitrust head, Delrahim made known his distaste for behavioral fixes, telling an audience last month that he was a law enforcer, not a regulator who would monitor companies' adherence to consent decree conditions.

While for decades the DOJ most often has imposed behavioral conditions on problematic vertical mergers, Delrahim's insistence that AT&T sell off Time Warner-owned Turner Broadcasting networks is part of a larger movement on the left and right toward structural relief in such deals.

The new antitrust chief reached his decision after reviewing the Obama administration's conclusion last year that it would sue to block Lam Research's bid for KLA-Tencor, a separate source said. The department generally considered the deal a vertical transaction, combining the No. 1 supplier of semiconductor fabrication equipment with a major provider of measuring and inspection equipment. In successfully pressuring the parties to walk away from the deal, the DOJ said Lam Research would have had the ability to foreclose its competitors by delaying their access to important KLA-Tencor equipment and services.

In any potential courtroom battle, the government and AT&T will focus their legal arguments on Time Warner acquisition's alleged harms and benefits. AT&T CEO has argued publicly and in meetings with the DOJ, the deal would allow his company to offer new video content designed for its wireless customers and utilize customer data to let advertisers tailor their messages to specific audiences. Vertical mergers can result in significant cost efficiencies, which is the major reason U.S. antitrust enforcers have been more reluctant to block the deals compared with transactions between direct competitors.

Delrahim, though, challenged Stephenson's efficiencies claims and told the executive that they could be realized through contractual agreements with Time Warner and didn't require the company's acquisition, a source familiar with the matter said.

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

1320 20th St. NW
Washington, DC  20036
202-601-2300

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

© 2017 by The Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum. Recipients shall not directly or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum. Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

**Edit your subscription** | **Unsubscribe**

**From:**
**To:**
**Subject:**

---

**From:**

**To:**
**Subject:**

---------- Forwarded message ----------
From: **Joshua Fineman (BLOOMBERG/ NEWSROOM:)** <jfineman@bloomberg.net>
Date: Tue, Nov 14, 2017 at 12:14 PM
Subject: Re:Fwd: Discovery/Scripps: Given AT&T/Time Warner Developments, Malone Common Ownership Issues May Raise Vertical Concerns
To:

```
tks
```

.................................................................................

To contact me please call 212-617-8953 work 917-402-6904 cell

```
From:                                At: 11/14/17 15:12:16
To: JO_____G/ NEWSROOM: )
Subject: Fwd: Discovery/Scripps: Given AT&T/Time Warner Developments,
Malone Common Ownership Issues May Raise Vertical Concerns
```

      ---------- Forwarded message ----------
      From: **The Capitol Forum** <editorial@thecapitolforum.com>
      Date: Tue, Nov 14, 2017 at 10:00 AM
      Subject: Discovery/Scripps: Given AT&T/Time Warner Developments, Malone Common Ownership Issues May Raise Vertical Concerns
      To:

Web Version  |  Update preferences  |  Unsubscribe



## Discovery/Scripps: Given AT&T/Time Warner Developments, Malone Common Ownership Issues May Raise Vertical Concerns

*Vol. 5 No. 384 - November 14, 2017 -* **_Click here_** *to access our library.*

**Deal Update**

Liberty Media Chairman John Malone's cross-ownership interests in Charter Communications and Discovery may raise DOJ concerns around whether Malone would be positioned to influence Discovery to foreclose programming from Charter's rivals post-merger.

Although the FCC in 2016 concluded that it would be unprofitable for Malone to foreclose Charter's rivals from Discovery programming, the analysis also identified certain Scripps programming as a substitute for certain Discovery content. However, because the instant transaction would unite Discovery and Scripps programming under common control, interviewed economists indicate that analyzing the deal would almost certainly require modifications to the FCC's previous diversion analysis.

The potential vertical issue arising from Malone's cross-ownership takes on increased importance given DOJ's aggressive position in an AT&T/Time Warner transaction which combines distribution and programming assets.

However, a number of factors ultimately distinguish the two deals, including Malone's lack of outright ownership of both content and distribution assets, Discovery/Scripps' lack of clear "must have" content, and the emergence of over the top content delivery options. Ultimately, then, although the Malone cross-ownership issue might require the parties additional time to resolve, it does not appear to be an issue likely to delay closing, or otherwise result in remedial action.

**The financial entanglements of John Malone and Advance Newhouse in Charter and Discovery.** The FCC examined potential foreclosure issues raised by Malone's ownership interests in both Charter and Discovery in connection with its review of the Charter/TWC transaction, which closed in 2016. The Charter/TWC transaction also involved the simultaneous acquisition of Bright House, a small cable company controlled by Advance Newhouse (AN), which also had an ownership interest in both Discovery and Charter.

Malone had an ownership interest in Discovery and sat on its Board of Directors.  Malone's holdings also included various stakes in Liberty Broadband and Liberty Interactive, which in turn held various stakes in Charter.  As part of its analysis, the FCC assumed that the Malone and AN ownership interests in both Charter and Discovery would align their incentives, increasing the likelihood that they would wield their joint influence to withhold Discovery programming from MVPDs that compete with Charter.

Although combining Malone's and AN's ownership interests overstates Malone's independent influence over Charter and Discovery, it accounts for the scenario that Malone and AN might act in concert to influence Charter or Discovery if each would benefit from the coordination.

In response to a request for comment, Discovery provided the following statement: "We are working with the Department of Justice to review the proposed transaction and continue to provide information in support of that review. We continue to anticipate closing the transaction by early 2018, bringing together a suite of world-class linear, digital and short-form entertainment brands to the benefit of consumers and business partners, and creating a more durable independent media company."

Scripps did not respond to a request for comment.

<u>**In Depth: Input Foreclosure the Most Significant Concern Raised by Cross Ownership**</u>

**Analytical approach to consider equity and diversion ratios.** The general input foreclosure concern in both Charter/TWC and Discovery/Scripps is that Malone and AN would jointly exert their influence over Charter and Discovery to increase the cost or completely withhold Discovery programming from Charter's rivals.

A profit maximizing firm would only engage in foreclosure if they expect their foreclosure revenue (generated from new Charter subscribers seeking withheld Discovery content) will exceed lost licensing revenue (affiliate fees and advertising revenues that would have been earned from licensing foreclosed MVPD rivals).  As the FCC is not reviewing the Discovery/Scripps transaction, DOJ will undertake an independent analysis of equity and diversion ratios to predict whether a foreclosure strategy would be profitable. It is likely that DOJ's findings will be similar to the FCC's findings in the Charter/TWC transaction as Malone's and AN's respective holdings in Charter and Discovery are largely unchanged.

Generally, the equity ratio represents the effective ownership that Malone and AN would have in both Charter and Discovery based on the ownership interests each has in various entities that hold Charter and Discovery equity. In Charter/TWC, the FCC found that Malone and AN would have a combined 35.8 percent equity share of Discovery and a combined 14.7 percent ownership interest in the new Charter entity.

The diversion ratio, generally, considers both the expected departure rate (the number of subscribers estimated to switch to Charter should they be foreclosed from Discovery programming) and the critical departure rate (the number of subscribers that would have to switch to Charter to make the foreclosure profitable).

Based in part on the equity ratio and diversion rates considered on a nationwide and DMA level basis, the FCC concluded that the relatively limited equity interests that Malone and AN would have in Charter (14.7 percent), relative to their equity interests in Discovery (35.8 percent) would make foreclosure unlikely.  Any additional revenue gained from subscribers switching to Charter to obtain otherwise foreclosed Discovery programming would be far outweighed by Discovery's potential loss of licensing and advertising revenues.  In other words, given the equity ratios, the level of diversion to Charter was determined to be insufficient to make a foreclosure strategy profitable.

**Scripps addition could potentially impact foreclosure analysis outcome.** An important component of the diversion analysis is the availability of programming substitutes. That is, subscribers of rival MVPDs might turn to these programming alternatives instead of switching to Charter should they be denied Discovery programming post-merger.

When identifying substitutes for Discovery in connection with the Charter/TWC transaction, the parties identified the History, National Geographic, Smithsonian, and Travel channels, PBS stations, and HGTV as substitutes for Discovery's general programming. Two of the identified Discovery programming substitutes, however, are Scripps networks - the Travel Channel and HGTV. These putative substitutes, would of course, be controlled by Discovery should it acquire the Scripps networks.  It follows that if subscribers foreclosed from Discovery programming have fewer programming substitutes, there is a greater likelihood that they will switch to Charter.

A subscriber of a foreclosed MVPD may be further encouraged to switch to Charter if additional popular content becomes part of the Discovery programming bundle that is foreclosed.  That is, if the Scripps programming is also denied to rival MVPDs once it becomes part of Discovery, it may incrementally increase the likelihood that subscribers would defect if they do not believe there are adequate substitutes to the foreclosed Scripps programming.

An economist not affiliated with the transaction stated, "from an economic perspective, it is possible that if formerly independent Scripps programming was considered as a substitute for general Discovery programming in the FCC's previous analysis, the diversion ratio could be different if Scripps and Discovery programming now became affiliated."

**In Depth: Numerous Factors Indicate that Foreclosure Will Not Require Remedial Action**

**Discovery/Scripps' lack of "must have" programming makes substitution less critical.** Although Discovery's acquisition of Scripps may, on the margins, increase the risk of post-merger foreclosure, there are a number of factors that suggest that DOJ concludes—as the FCC did in 2016 —that a Charter-focused foreclosure strategy would not be profitable in the Discovery/Scripps transaction.

The degree to which Discovery programming and Scripps programming are considered substitutes will certainly affect the level of diversion if both are withheld from subscribers.  But an important related inquiry goes to how critical subscribers consider the foreclosed programming itself. That is, if subscribers do not view programming as "must-have," they will be less inclined to switch to another MVPD provider if that programming is withheld.

Certain types of programming such as sports, broadcast network programming, and certain news channels may be considered "must have" or marquee programming by subscribers – a point at the heart of the DOJ's foreclosure concerns in the AT&T/Time Warner transaction. While popular, it is unlikely that either Discovery or Scripps programming is considered to be "must have" by subscribers.

In the Charter/TWC review, Discovery itself asserted that it "does not offer the type of broadcast network or regional sports programming that would cause subscribers to switch MVPDs." And, according Discovery, it would not be profitable for it to foreclose Charter's competitors because, "not only would it lose licensing fees and advertising revenues, viewers would find substitutes and stop watching its programming."

A number of metrics—most notably, the companies' declining subscriber bases—support this view of

the Discovery and Scripps programming. Moreover, according to an RBC Capital Market Report, Scripps has a 5 percent ratings share but represents only 1.7 percent of affiliate fees. Discovery has an 8.1 percent rating share but receives only 5.3 percent of affiliate fees. This indicates that at the bargaining table, Discovery and Scripps are not considered to be "must have" programming by MVPDs as much as other networks such as Disney, which has an 8.5 percent rating share but accounts for 34.4 percent of affiliate fees.

The lack of marquee programming offered by both Discovery and Scripps likely dampens the level of diversion of foreclosed subscribers to Charter as well as the impact of any putative substitution between the programming of the two networks.

**OTT, broadband issues.** The emergence of "over the top" (OTT) could also mitigate the effectiveness of a foreclosure strategy. OTT refers to the delivery of content via the internet without requiring users to subscribe to cable or satellite pay-tv service like Charter or DIRECTV. If foreclosed subscribers can obtain Discovery or Scripps programming without the need to switch to Charter, a foreclosure strategy would be less successful.

There is a growing list of OTT service providers such as DirecTV NOW, Sling, Hulu, PlayStation Vue, and YouTube TV offering customers the opportunity for highly personalized content delivery, including access to Discovery and Scripps programming.  And while Discovery and Scripps do not currently offer a separate OTT option, the companies are expected to offer such service in the near term. Indeed, one of the purported benefits of the merger is the ability to provide a more compelling OTT option by combining popular Discovery and Scripps programming.

But OTT usually requires a broadband connection, which is generally provided by the customer's local cable company.  Eric Schumacher-Rasmussen, editor at StreamingMedia.com explains, "customers seeking to cut the cable cord cannot completely free themselves from the cable company, at least today.  And while there are nascent services such as Verizon go90 and Vivendi Studio+ that are pure wireless plays, customers choosing an OTT option will more likely than not have to rely on their broadband cable provider to enjoy OTT service."

The question then becomes whether OTT is a viable mitigating factor if Charter stands to gain even if subscribers of its MVPD rivals depart to an OTT option, rather than switching directly to Charter's pay TV service.  In theory, Charter could realize increased revenues from new broadband customers or if existing broadband customers upgrade their data package to accommodate for increased data usage for OTT services.

Broadband data and pay TV, however, are currently available as separate services and a proliferation of OTT services would not necessarily mean increased revenues for cable broadband services. It is common that pay TV subscribers to Charter's rivals such as DISH and DirecTV are already Charter broadband customers as satellite data transmission is less than ideal.  And, at least today, broadband service pricing is not tiered in terms of the amount of data consumed, but rather by upload and download speeds.

Schumacher-Rasmussen believes that while there could be opportunities for mischief—for example Comcast has been accused of throttling transmission speed of Netflix once a certain amount of data has been consumed—that is not yet a documented widespread concern.

**Other factors counseling against the likelihood of foreclosure.** For Discovery to employ a foreclosure strategy that would benefit Malone and AN by virtue of their interest in Charter, such strategy could also involve the company potentially violating its fiduciary duty to company shareholders. This is especially the case given that, Discovery directors, such as Malone, must recuse themselves from any decision that involves or affects their personal, business, or professional interests.

Likewise, assuming there have not been any corporate governance changes since the closing of the Charter/TWC transaction in 2016, there are numerous controls in place that would prevent Malone and AN from improperly influencing Charter. These include, among other things, that programming-related transactions require approval by a majority of unaffiliated directors. The Charter Board of

Directors' 13-member composition ensures that the five directors that Malone and AN can nominate would not be able to cause Charter to undertake conflicted transactions that do not benefit Charter as a whole.

Finally, since the closing of the Charter/TWC transaction, there do not appear to have been reported incidents where Malone or AN have attempted to use their influence to cause Charter or Discovery to seek supra-competitive affiliate fees or to foreclose competing MVPDs altogether from Discovery programming.

**Differences between AT&T/Time Warner and Discovery/Scripps reviews.** The DOJ's aggressive position in the AT&T/Time Warner review raises the possibility of increased scrutiny on the Discovery/Scripps transaction. However, although the DOJ's aggressive position certainly demonstrates an increased interest in vertical foreclosure issues in the MVVPD space, there are significant difference between the two transactions.

The primary difference is that AT&T/Time Warner is a vertical transaction through which a significant MVPD is purchasing a significant content provider. The Discovery/Scripps transaction, by contrast, does not involve distribution assets that would make foreclosure more probable. Although Malone's cross ownership interest in both Discovery and Charter introduces a vertical relationship between distribution and content that creates some similarities with the AT&T/Time Warner transaction, there are several additional factors that distinguish the two transactions.

One significant differentiator is that AT&T is directly acquiring a 100 percent interest in Time Warner's programming.  Thus, there are no equity ratios, speculation regarding aligned incentives due to partial ownership interests, assumptions that fiduciary duties would be ignored, or corporate governance safeguards against interested transactions. These factors reducing the likelihood of foreclosure are not present in the AT&T/Time Warner transaction.

The quality of the content at play is also a significant differentiator. In the AT&T transaction, the foreclosure concerns are driven in large part by the fact that many of Time Warner's cable networks transmit content that is perceived to be vital to subscribers of rival MVPDs, such as exclusive NBA, MLB, and NCAA Men's Basketball tournament programming. This programming is considered "must have" insofar as subscribers would not view other programming, even alternative sports programming, as adequate substitutes, and may therefore switch MVPDs to regain access to the content, if withheld.

While Discovery and Scripps both have popular programming, neither appear to have content that subscribers would consider to be "must have" in nature.  This is evidenced by the lower affiliate fees that both Discovery and Scripps receive in proportion to their rating share as well as Discovery's own acknowledgement that it, "does not offer the type of broadcast network or regional sports programming that would cause subscribers to switch MCPDs."

Accordingly, although the cross-ownership issue might require the parties to spend additional time to resolve, particularly in light of the recent AT&T/Time Warner developments, it does not appear to be an issue that would delay closing or result in remedial action.

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

1333 29th St. NW
Washington DC 20038
202-601-2300

© 2017 by The Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum. Recipients shall not directly or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum. Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

**Edit your subscription** | **Unsubscribe**

**From:**
**To:**
**Subject:**

---

**From:** ███████████████
███ ████████████████████
**To:** ████████████████████
**Subject:** ████████████████████████████████
████████████████████

---------- Forwarded message ---------
From: ███████████ ██████████████████
Date: Thu, Nov 16, 2017 at 2:27 PM
Subject: Fwd: AT&T/Time Warner: As Sides Show No Signs of Nearing Settlement, Delrahim Issues Biting Critique of Behavioral Remedies
To: Joshua Fineman <jfineman@bloomberg.net>

---------- Forwarded message ---------
From: **The Capitol Forum** <editorial@thecapitolforum.com>
Date: Thu, Nov 16, 2017 at 12:40 PM
Subject: AT&T/Time Warner: As Sides Show No Signs of Nearing Settlement, Delrahim Issues Biting Critique of Behavioral Remedies
To: ████████████████████████████

Web Version | Update preferences | Unsubscribe



## AT&T/Time Warner: As Sides Show No Signs of Nearing Settlement, Delrahim Issues Biting Critique of Behavioral Remedies

*Vol. 5 No. 386 - November 16, 2017 - **Click here** to access our library.*

<u>**DOJ Update**</u>

As AT&T and DOJ show no signs of nearing a settlement, DOJ antitrust chief Makan Delrahim on Thursday issued a withering critique of behavioral remedies, the foundation of the two sides' earlier consent decree talks.

If Delrahim's speech hardened the DOJ's position on the deal, AT&T itself has shown no signs of acceding to DOJ's demands, and has offered no significant structural proposal to address Delrahim's request that the company sell off Turner Broadcasting networks, a source familiar with the matter said. The DOJ has until the end of the month to decide whether to sue or accept a settlement, sources said.

In a Tuesday meeting, Delrahim told leaders of the American Bar Association's antitrust section that he could file suit at any time or, with the permission of the parties, extend the department's review, a

source familiar with the meeting said.

A suit based on Delrahim's criticisms could clarify a long-running debate over whether antitrust enforcers should handle anticompetitive harms in verticals deals such as AT&T/Time Warner through behavioral remedies. Dealmakers have expressed alarm that a DOJ court victory could chill the environment for mergers and acquisitions. An adverse court ruling, however, could make it more difficult for US antitrust enforcers to address competition concerns arising from vertical transactions.

An AT&T spokesman confirmed Wednesday that the company and Time Warner had hired Daniel Petrocelli of O'Melveny & Meyers as lead trial counsel in the event DOJ sues.

**Delrahim speech.** In his Thursday speech at the ABA Fall Forum, Delrahim sharply criticized behavioral remedies as ineffective and overly regulatory.

"At times antitrust enforcers have experimented with allowing illegal mergers to proceed subject to behavioral commitments. That approach is fundamentally regulatory, imposing ongoing government oversight on what should preferably be a free market," he said.

Cloaking his criticism of conduct remedies in a deregulatory, free-market conservative vocabulary—and citing antitrust scholars ranging from Robert Bork to John Kwoka—Delrahim argued that conduct remedies "require centralized decisions instead of a free market process. They also set static rules devoid of the dynamic realities of the market," he added.

Notably, Delrahim directly criticized arbitration remedies, which DOJ and the parties had discussed as a potential fix to foreclosure issues arising from the AT&T/Time Warner transaction. He said arbitration distorted the competitive process, and described an arbitrator as akin to a central planner.

Although Delrahim did not mention AT&T/Time Warner by name, he did cite a June 21 letter from 11 Senate Democrats calling for close scrutiny of the telecom tie-up. Delrahim mentioned the Democrats' contention that "after reviewing conditions placed on the Comcast-NBCUniversal deal, we believe that the demonstrated lack of enforceability and reliability of such conditions have rendered them insufficient as remedies for deals of this nature." The view is largely consistent with the DOJ front office's opinion of the NBCU conditions' effectiveness, a source familiar the matter said.

Delrahim also argued that such conditions have "proven challenging to enforce" and "demand ongoing monitoring and enforcement." Conditions also raise difficult questions about duration—an issue that was a key sticking point in AT&T/DOJ settlement talks.

"Behavioral remedies often require companies to make daily decisions contrary to their profit-maximizing incentives … It is the wolf of regulation dressed in the sheep's clothing of a behavioral decree," he said. "If a merger is illegal, we should only accept a clean and complete solution."

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

1200 20th St. NW
Washington, DC, 20036
202-601-2300

© 2017 by The Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum. Recipients shall not directly or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum. Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

**Edit your subscription** | **Unsubscribe**