# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | | |
|---|---|---|
| DBW PARTNERS, LLC | : | |
| d/b/a THE CAPITOL FORUM, | : | |
| | : | Case No.: 19-cv-3715-RBW |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BLOOMBERG, L.P. and | : | |
| BLOOMBERG FINANCE, L.P., | : | |
| | : | |
| Defendants. | : | |

---

## CAPITOL FORUM'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
## <u>ON ITS CONTRIBUTORY INFRINGEMENT CLAIM</u>

## TABLE OF CONTENTS

I.   INTRODUCTION ...........................................................................................................1

II.  PRELIMINARY STATEMENT ...................................................................................2

III. STATEMENT OF FACTS ........................................................................................... 4

    A. Capitol Forum ...................................................................................................... 4

    B.  Bloomberg............................................................................................................ 5

    C.  Bloomberg's Solicitation of Capitol Forum Subscribers .................................... 6

IV. ARGUMENT ................................................................................................................ 9

    A. The Law on Contributory Infringement............................................................... 9

    B. Bloomberg is Liable for Contributory Infringement ........................................ 12

    C. The First Amendment is Not a Defense to Copyright Infringement .................14

    D. Bloomberg "Substantially Participated" in the Infringing Activities................18

V. CONCLUSION .............................................................................................................19

# TABLE OF AUTHORITIES

**Cases**   **Page**

*A&M Records, Inc. v. Napster, Inc.,*
239 F.3d 1004 (9th Cir. 2001), *as amended* (Apr. 3, 2001) ............................................10

*Anti-Defamation League of B'nai B'rith v. Superior Court,*
67 Cal. App. 4th 1072 (1998) ........................................................................................17

*Arista Records, LLC v. Doe 3,*
604 F.3d 110 (2d Cir. 2010) ..........................................................................................10

*Balsley v. L.F.P., Inc.,*
No. 1:08-cv-491, 2008 WL 11378897 (N.D. Ohio Dec. 2, 2008) ....................................19

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC,*
69 F. Supp. 3d 342 (S.D.N.Y. 2014) ...................................................................10, 12, 14

*Cable/Home Commc'n Corp. v. Network Prods., Inc.,*
902 F.2d 829 (11th Cir. 1990) .......................................................................................14

*Call of the Wild Movie, LLC v. Does 1-1,062,*
770 F. Supp. 2d 332 (D.D.C. 2011) ...........................................................................2, 15

*Eldred v. Reno,*
239 F.3d 372 (D.C. Cir. 2001) .......................................................................................15

*Eldred v. Ashcroft,*
537 U.S. 186 (2003) ................................................................................................15, 16

*Flava Works, Inc. v. Gunter,*
689 F.3d 754 (7th Cir. 2012) ....................................................................................11, 19

*Gershwin v. Columbia Artists,*
443 F.2d 1159 (2d Cir. 1971) ..................................................................................2, 11, 14

*Gordon v. Pearson Educ., Inc.,*
85 F. Supp. 3d 813 (E.D. Pa. 2015) ......................................................................10, 12, 14

*Hard Drive Prods., Inc. v. Does 1-1,495,*
892 F. Supp. 2d 334 (D.D.C. 2012) .............................................................................1, 15

*Harper & Row Publishers, Inc. v. Nation Enters.,*
471 U.S. 539 (1985) ..................................................................................................1, 14

*Home & Nature, Inc. v. Sherman Specialty Co.,*
    322 F.Supp.2d 260 (E.D.N.Y. 2004) ..............................................................10

*In re Aimster Copyright Litig.,*
    334 F.3d 643 (7th Cir. 2003) ................................................................10, 12

*Krasselt v. Joseph E. Seagram & Sons,*
    2002 WL 1997926 (S.D.N.Y. Aug. 29, 2002) ................................................10

*Landmark Commc'ns, Inc. v. Virginia,*
    435 U.S. 829 (1978) ......................................................................................17

*Luck's Music Library, Inc. v. Ashcroft,*
    321 F. Supp. 2d 107 (D.D.C. 2004), *aff'd sub nom., Luck's Music Library, Inc. v.*
    *Gonzales,* 407 F.3d 1262 (D.C. Cir. 2005) ..................................................16

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005) .............................................................................. *passim*

*Monotype Imaging, Inc. v. Bitstream, Inc.,*
    376 F. Supp. 2d 877 (N.D. Ill. 2005) ............................................................10

*New Era Publications Int'l, ApS v. Henry Holt & Co.,*
    873 F.2d 576 (2d Cir. 1989) .........................................................................16

*Newborn v. Yahoo!, Inc.,*
    391 F. Supp. 2d 181 (D.D.C. 2005) ......................................................... *passim*

*Nicholson v. McClatchy Newspapers,*
    177 Cal. App. 3d 509 (Ct. App. 1986) ..........................................................17

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,*
    166 F.3d 65 (2d Cir. 1999) ...........................................................................16

*Oak Indus., Inc. v. Zenith Elecs. Corp.,*
    697 F. Supp. 988 (N.D. Ill. 1988) ................................................................11

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,*
    No. C 04-0371 JW, 2004 WL 1773349 (N.D. Cal. Aug. 5, 2004) ...................10

*Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.,*
    982 F. Supp. 503 (N.D. Ohio 1997) .................................................11, 14, 19

*Seminole Tribe of Fla. v. Times Pub. Co.,*
    780 So. 2d 310 (Fla. Dist. Ct. App. 2001) ....................................................17

*Smith v. Daily Mail Pub. Co.,*
    443 U.S. 97 (1979)...........................................................................................2, 17

*Sony Music Entm't Inc. v. Does 1-40,*
    326 F. Supp. 2d 556 (S.D.N.Y. 2004).............................................................15

*United Video, Inc. v. F.C.C.,*
    890 F.2d 1173 (D.C. Cir. 1989).......................................................................16

*Universal City Studios, Inc. v. Reimerdes,*
    82 F.Supp.2d 211 (S.D.N.Y. 2000) ....................................................1, 15, 16

*Water Techs. Corp. v. Calco, Ltd.,*
    850 F.2d 660 (Fed. Cir. 1988).........................................................................11

**<u>Rules:</u>**
Fed. R. Civ. P. 56..............................................................................................1, 2

**<u>Other Sources:</u>**
3 Melville B. Nimmer & David Nimmer,
    Nimmer on Copyright § 12.04[A][3][a] ............................................................3

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, DBW Partners LLC, doing business as The Capitol Forum ("Capitol Forum"), respectfully files this memorandum in support of its motion for partial summary judgment, seeking a determination that defendants Bloomberg, L.P. and Bloomberg Finance, L.P. (collectively "Bloomberg"), have engaged in the contributory infringement of 103 of Capitol Forum's copyrighted publications, with the amount of damages to be determined at trial.

## I.      INTRODUCTION

This motion rests on two principal factors.  The first is Bloomberg's admission to Capitol Forum that it has routinely contacted Capitol Forum subscribers and asked them to provide it with Capitol Forum's copyrighted publications, which they do.  This is a clear contributory copyright violation: the "classic instance of inducement."  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 916, 937 (2005).  Bloomberg cannot deny its actions in this regard—and will not in this proceeding.  The second factor is Bloomberg's (supposed) legal defense to this conduct, revealed in its recently filed motion to dismiss papers.  According to Bloomberg, it has a "First Amendment privilege" to solicit and induce contributory copyright violations, claiming that this privilege "protects a journalist's right to exchange information and documents with sources in the service of newsgathering."  *See* Dkt. 12-1 at p. 2.

There is no such privilege and thus no defense to Bloomberg's conduct.  Since the Supreme Court's decision in *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 555-60, 569 (1985), it is "unmistakably clear that the First Amendment does not shield copyright infringement," *Universal City Studios, Inc. v. Reimerdes,* 82 F.Supp.2d 211, 220 (S.D.N.Y. 2000), and this rule has been consistently applied in this Court.  *See Hard Drive Prods., Inc. v. Does 1-1,495,* 892 F. Supp. 2d 334, 338 (D.D.C. 2012) ("the First Amendment's protection is

1

not absolute and does not extend to copyright infringement."); *Call of the Wild Movie, LLC v. Does 1-1,062*, 770 F. Supp. 2d 332, 349 (D.D.C. 2011) ("[c]opyright infringement is not protected by the First Amendment.").  In its motion to dismiss papers, Bloomberg avoids this settled precedent and relies instead on a handful of cases that have nothing to do with copyright law.  Moreover, even these cases make clear that no journalistic privilege can exist *in any context* if the material at issue is not "lawfully obtained."  The Supreme Court is firm on this issue as well, *Smith v. Daily Mail Pub. Co.,* 443 U.S. 97, 105-106 (1979), and the solicitation and inducement of third-party copyright violations is plainly illegal.

Under Rule 56, a motion for summary judgment can be raised at any time and should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  This is the case here, and a determination on this issue at this time will expedite the resolution of this entire litigation.

## II.    PRELIMINARY STATEMENT

There are three causes of action in this litigation: contributory infringement, direct infringement, and misappropriation.  This motion concerns only the contributory infringement claim—and is based on Bloomberg's admission to Capitol Forum's Chief Executive Officer that it has routinely approached Capitol Forum subscribers and asked them to provide it with the Capitol Forum copyrighted articles.

The law and facts are clear cut.  It is a violation of the Copyright Act to knowingly induce others to commit copyright violations.  *See Grokster,* 545 U.S. at 930 ("[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement."); *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971) ("one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing

conduct of another, may be held liable as a 'contributory' infringer."); *Newborn v. Yahoo!, Inc.,* 391 F. Supp. 2d 181, 186 (D.D.C. 2005) (same).  As *Nimmer on Copyright* states: "a party who, with knowledge of the infringing activity, induces causes or materially contributes to the infringing conduct of another, may be held liable as a contributory infringer."  Section 12.04[A][3][a] page 12-85.

That is precisely what has happened here.  Since early 2016, Bloomberg, through its reporter, Joshua Fineman, has been contacting Capitol Forum's subscribers and asking them to send him the copyrighted Capitol Forum publications, which they do.  Mr. Fineman knows that the Capitol Forum publications are copyrighted and protected; first because Capitol Forum has refused to provide him with its copyrighted materials and requested that he stop soliciting its subscribers; second because the Capitol Forum materials he receives have an explicit copyright notice; and third because Bloomberg has its own copyright restrictions with its subscribers, which it routinely enforces.

As noted above, this case involves the "*classic instance of inducement*," namely, when a defendant "*solicit[s]…others to commit violations.*"  *Grokster,* 545 U.S. at 916, 937 (emphasis added).  Moreover, while proof of a "solicitation" is sufficient in and of itself to establish the contributory infringement claim, in this case Bloomberg does more than merely ask the subscribers for the Capitol Forum material.  Here, Mr. Fineman enhances his solicitation of the Capitol Forum subscribers by trading favors and information, providing them with access to market information they did not otherwise possess—conduct calculated to increase the likelihood he will receive the copyrighted material.

Bloomberg's assertion of a First Amendment privilege is a last-ditch attempt to stave off its ultimate liability and to delay this case.  This defense was not raised in the discussions

between the parties.  When Capitol Forum approached Bloomberg to demand that the conduct

stop and asked what legal basis Bloomberg had for its solicitation of Capitol Forum's

copyrighted reports, Bloomberg's only response was that this "business model" was successful.

When Capitol Forum objected and told Bloomberg that it should not contact its subscribers,

Bloomberg's response was laughter.  Bloomberg's position that it is merely engaging in a

protected journalistic practice is factually and legally bereft.  Bloomberg will present this Court

with no evidence that this is any sort of acceptable journalistic practice, practiced by any

responsible publisher.  To the contrary, the notion that a journalist, any journalist, can solicit and

induce copyright violations would wreak havoc upon time-honored copyright protections and

protocols.  And for the purpose of this motion, there is no legal basis whatsoever for

Bloomberg's position that the First Amendment shields its contributory copyright violations.

## III.     STATEMENT OF FACTS

### A.  Capitol Forum

Capitol Forum is an investigative news and analysis company, in the business of

providing time-sensitive and in-depth reports to its subscribers, including investors, industry

stakeholders, law firms and policymakers.  Founded in 2012, it publishes a premium internet-

based subscription service, releasing anywhere between 30 and 50 reports each month on matters

relating to mergers and acquisitions, consumer protection, government contracts, corporate

investigations, and antitrust enforcement.  Capitol Forum's reports are extensively researched

and carefully written, often the product of months of work, and its subscribers rely on these

reports to make investment and business decisions.  Given the respected nature of Capitol Forum

and its journalists, the release of its reports will often affect the price of publicly traded stocks—

and will do so in a matter of minutes.  *See* Plaintiff's Statement of Material Facts ("SOMF") ¶¶

4

1-3.

Capitol Forum's reports constitute a fundamental and competitively significant component of its business and are duly registered with the United States Patent and Copyright Office. These reports are provided only to its subscribers and to other authorized recipients. All subscribers must sign a subscription agreement in which they agree not to transmit or reproduce the copyrighted material, and each report contains a copyright notice and disclosure stating that its contents may not be distributed or reproduced without Capitol Forum's permission:

> © 2017 by the Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum. Recipients shall not directly, or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from the Capitol Forum. Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

*See* SOMF ¶¶ 4-7.

### B. Bloomberg

Bloomberg is one of Capitol Forum's competitors and holds a dominant position in the financial information industry. Virtually all financial market participants subscribe to a Bloomberg "terminal," providing them with access to a number of products, including its "First Word" service which focuses on time-sensitive market developments. *Id.* ¶ 8.

While both Capitol Forum and First Word provide subscription services to the financial market, their business models are significantly different. Capitol Forum invests heavily in extensive market research and first-hand interviews with market participants and will provide lengthy and in-depth analyses to its subscribers. First Word, on the other hand, will generally obtain its information from its competitors, including Capitol Forum, which it will quickly repackage and republish to its subscribers. Bloomberg is not an authorized recipient of Capitol

5

Forum's copyrighted material.  *Id.* ¶¶ 9-10.

Bloomberg knows that the Capitol Forum publications it received from the Capitol Forum subscribers are copyright protected and cannot be transmitted or copied or summarized without permission.  All Bloomberg publications, including its First Word publications, are copyrighted, and bear a copyright disclosure.  Bloomberg also enters into subscription agreements with its subscribers, prohibiting the subsequent transmission and reproduction of the First Word reports.  Bloomberg's website warns its readers that the summarization and copying of its articles is a copyright violation.  And Bloomberg enforces its own copyright protections. For example, in a recent complaint filed in the Southern District of New York, Bloomberg is seeking to prevent any non-subscriber from receiving "the benefit of Bloomberg's labor and expertise without obtaining the necessary data license or paying Bloomberg the requisite fee." *Id.* ¶ 21.

### C.  Bloomberg's Solicitation of Capitol Forum Subscribers

When Capitol Forum began operations, and before it applied for copyright protection, it would send some of its articles to Mr. Fineman, as it generated exposure for the company.  Over time, as Capitol Forum became more recognized in the financial community, and as its subscribers began expressing concern that its material was also appearing on Bloomberg's First Word service, Teddy Downey, Chief Executive Officer of Capitol Forum, informed Mr. Fineman in May 2013 that Capitol Forum would no longer forward or share its reports with Bloomberg. *Id.* ¶ 11.

Mr. Fineman soon found another source for the Capitol Forum articles:  Capitol Forum's subscribers.  Even after Capitol Forum received its copyright registration in 2016, and its articles contained copyright disclosures stating that transmission and copying of the articles was

forbidden, Mr. Fineman continued to solicit Capitol Forum subscribers and continued to repackage and republish its copyrighted material.  *Id.* ¶ 12.

In April 2017, Teddy Downey met in New York with Mr. Fineman and his First Word editor, Arie Shapira.  Mr. Downey informed them that he objected to their solicitation of his subscribers and asked them to stop.  He suggested that if they needed particular information for a particular purpose, they should contact him directly and he would consider the request.  Mr. Fineman and Mr. Shapira laughed at this suggestion.  Mr. Downey also questioned the legality of obtaining the Capitol Forum material through its subscribers.  In response, they admitted that Mr. Fineman had contacted Capitol Forum subscribers to ask for and to obtain Capitol Forum articles, and stated that this "business model" had proven successful.  *Id.* ¶ 13.

Despite Mr. Downey's request, Mr. Fineman continued to solicit Capitol Forum subscribers and continued to repackage and republish Capitol Forum's material.  An example is set forth in the Downey Declaration, demonstrating the sequence of transmission of Capitol Forum articles to Mr. Fineman.  In particular:

a. At 11:00 a.m. (Eastern) on August 22, 2017, Capitol Forum transmitted a copyrighted article report to one of its subscribers, to his business e-mail address;

b. This Capitol Forum report, like all Capitol Forum reports, includes the following copyright notice:

© 2017 by the Capitol Forum.  The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum.  Recipients shall not directly, or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum.  Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

c. At 11:17 a.m. that day, the subscriber transmitted the Capitol Forum report to Mr. Fineman, using his gmail address rather than his business e-mail address;

7

d.  At 11:18 a.m. that day, Mr. Fineman acknowledged the receipt of the transmission of the Capitol Forum article by responding "TKS" to the subscriber's gmail address.

e.  At 11:36 a.m. that day, Bloomberg repackaged and republished the Capitol Forum report, highlighting and quoting essential points of the article.[1]

*Id.* ¶ 14.

In December 2017, Capitol Forum discovered the identity of the subscriber who had been providing its articles to Mr. Fineman, a West Coast hedge fund.  Mr. Downey contacted the hedge fund manager and asked if he had been sending articles to Mr. Fineman.  The manager replied:

> I'm sorry—yes, I have shared some articles with him.  He had done me favors by getting me access to stuff I didn't have, but I should not have sent him anything of yours without your permission.  I am really sorry about this—it will not happen again.

*Id.* ¶ 16.

In a subsequent email, the hedge fund manager explained his interactions with Mr. Fineman:

> Josh would typically reach out to me over the course of 2017 via Bloomberg chat to see if I had a story.  If I did, and again I feel TERRIBLE about this, I would *sometimes* (not always) forward it [to] him—although all of this stopped when you contacted me in December 2017.

*Id.* ¶ 17.

The manager then went on to describe and forward another instance in which Mr. Fineman had approached him, this one involving an article from a publication other than Capitol

---

[1] Bloomberg's repackaging and republication of the Capitol Forum material is provided only for context.  It is not an element of the contributory infringement claim.

Forum.  *Id.* ¶ 18.  While the manager apparently stopped sending Capitol Forum material to Mr. Fineman in December 2017, Mr. Fineman soon found another subscriber (or subscribers) to send him the Capitol Forum articles.  *Id.* ¶ 19.

Since December 2017, Bloomberg has received and republished over 40 Capitol Forum copyrighted articles.  Since 2016, when Capitol Forum obtained its copyright registration, Bloomberg has solicited and received at least 103 copyrighted Capitol Forum articles from Capitol Forum subscribers.  These publications are identified in Exhibit K to the Downey Decl. Each one of these publications was copyrighted and bore the same copyright disclosure and warning set forth above.  No solicitation or transmission of these articles was permitted by Capitol Forum.  *Id.* ¶ 20; Downey Declaration, Ex. K, listing the publications.

Capitol Forum believes that the number of its publications improperly solicited and received by Bloomberg exceeds the 103 publications described above, but this information rests, for the time being, with Bloomberg.

## IV.     ARGUMENT

### A.  The Law on Contributory Infringement

As this Court has held, there are three essential elements to a contributory copyright cause of action.  The plaintiff must prove: (1) direct infringement by a third party; (2) knowledge by the defendant of the third-party infringement; and (3) substantial participation by the defendant in the infringing activity.  *Newborn,* 391 F.Supp.2d at 186.

The first prong of the contributory infringement analysis—direct copyright infringement by a third party—requires the plaintiff to establish: (a) the identity of the specific copyrighted works that were infringed; (b) proof of ownership to the copyrights in those works; (c) registration of those copyrights; and (d) proof as to the acts and times of the infringements.  *Id.*

(citing *Home & Nature, Inc. v. Sherman Specialty Co.,* 322 F.Supp.2d 260, 266 (E.D.N.Y. 2004)

(quoting *Krasselt v. Joseph E. Seagram & Sons,* 2002 WL 1997926, at *1 (S.D.N.Y. Aug. 29,

2002)).

  The second prong of the contributory copyright infringement analysis—proof that the

defendant had knowledge of the direct infringement—can be demonstrated by a showing that the

defendant was notified of the potential infringement and failed to prevent future infringements.

It can also be demonstrated by a showing that the defendant "willfully blind[ed]" itself to the

infringement.  *Newborn,* 391 F.Supp.2d at 186 (citing *Monotype Imaging, Inc. v. Bitstream, Inc.,*

376 F. Supp. 2d 877, 886 (N.D. Ill. 2005), and *In re Aimster Copyright Litig.,* 334 F.3d 643, 650

(7th Cir. 2003)).

  As the Seventh Circuit stated in the appeal of the *Aimster* decision, "willful blindness is

knowledge."  *Aimster,* 334 F.3d at 650.  Moreover, it has long been held that the knowledge

standard is an objective one, and "contributory infringement liability is imposed on persons who

'know or have reason to know' of the direct infringement."  *Arista Records, LLC v. Doe 3*, 604

F.3d 110, 118 (2d Cir. 2010) (citing *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1020

(9th Cir. 2001), *as amended* (Apr. 3, 2001)); *see also Gordon v. Pearson Educ., Inc.,* 85 F. Supp.

3d 813, 822 (E.D. Pa. 2015); *BWP Media USA Inc. v. Hollywood Fan Sites, LLC,* 69 F. Supp. 3d

342, 356 (S.D.N.Y. 2014).  Even constructive knowledge is sufficient to meet this requirement.

*See Napster,* 239 F.3d at 1020, n. 5 (noting that the Napster executives were experienced in the

industry and had enforced their intellectual property rights previously).

  The third element of a contributory copyright infringement claim—that the defendant

substantially participated in the infringing activity—requires the plaintiff to show "a relationship

between the ... services provided by the [d]efendant[ ] and the alleged infringing activity as

opposed to the mere operation of the website businesses." *Newborn,* 391 F. Supp. 2d at 186 (citing *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,* No. C 04-0371 JW, 2004 WL 1773349, at *4 (N.D. Cal. Aug. 5, 2004)).  As the Supreme Court stated in *Grokster,* "the classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations."  545 U.S. at 916, 937.  The *Grokster* opinion also described the type of "inducement" activity sufficient to satisfy the "substantial participation" requirement, including "active steps . . . to encourage direct infringement" and "actively and knowingly aid[ing] and abet[ing] another's direct infringement[.]" *Id.* at 936 (citing *Oak Indus., Inc. v. Zenith Elecs. Corp.,* 697 F. Supp. 988, 992 (N.D. Ill. 1988) and *Water Techs. Corp. v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed. Cir. 1988)).

A more specific litany of examples is set forth by the Second Circuit in *Gershwin, supra,* including the placement of non-infringing advertisements for the sale of infringing records, the shipment of infringing records, and the sale by a department store of infringing records.   All of these entities could be held liable for contributory infringement if they knew or had reason to know of the infringing nature of the records.   443 F.2d at 1162.  Subsequent decisions provide more granular examples of the "substantial participation" requirement, and state that defendants can be held liable for contributory infringement in situations in which they (1) "invited people to post copyrighted videos;"[2] (2) "encouraged subscribers to upload [copyrighted] information;"[3]

---

[2] *Flava Works, Inc. v. Gunter,* 689 F.3d 754, 758 (7th Cir. 2012).

[3] *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.,* 982 F. Supp. 503, 514 (N.D. Ohio 1997).

(3) "recruit[ed] individuals….to 'steal' photographs;"[4] and (4) transmitted copyrighted photographs to third parties.[5]

### B.  Bloomberg is Liable for Contributory Infringement

In this case, all three elements of the contributory infringement claim are easily met.  For the first prong—direct infringement of Capitol Forum's copyright by a third party—the evidence demonstrates that Capitol Forum subscribers infringed Capitol Forum's copyright by transferring Capitol Forum's copyrighted materials to Bloomberg.  Using the elements set forth in *Newborn*, *supra,* the Downey Declaration: (1) describes the Capitol Forum copyrighted materials that its subscribers transferred to Bloomberg contrary to the copyright notice on those materials (*see* SOMF ¶¶ 14, 19-20); (2) establishes that Capitol Forum owns the copyright notice to those materials (*see id.* ¶ 5); (3) establishes that Capitol Forum has registered its copyright for those materials (*id.*); and (4) details the specific instances in which Bloomberg solicited the third-party subscribers to send it Capitol Forum's copyrighted materials in violation of the explicit copyright protections.  *See id.* ¶¶ 14-20.

The second prong of the contributory analysis:  "where a party has been notified of specific infringing uses of its technology and fails to act to prevent future such infringing uses, or willfully blinds itself to such infringing uses"[6] – is established in this case by the evidence of Bloomberg's intentional request for, and knowing receipt of, Capitol Forum's copyrighted reports, all which bear an explicit copyright notice.  *See id.* ¶¶ 13-19.  This is not mere willful blindness found sufficient in other cases.  *See, e.g., Aimster,* 334 F.3d at 650.  It is intentional

---

[4] *BWP Media USA,* 69 F. Supp. 3d at 356.

[5] *Gordon,* 85 F. Supp. 3d at 822.

[6] *Newborn,* 391 F.Supp.2d at 186.

knowing action.  It is far more certain proof than the cases in which knowledge was established merely by the failure to incorporate blocking software.  *See Grokster*, 545 U.S. 913.

In this case, Bloomberg had actual and constructive knowledge of the direct infringement by the Capitol Forum subscribers.  First, the very reason for Bloomberg's solicitation of the subscribers is because it does not have its own access or subscription to the Capitol Forum publications, and knows it has to obtain the publications from Capitol Forum subscribers.  *See* SOMF ¶ 11.  Second, each one of the Capitol Forum publications that Bloomberg receives bears the Capitol Forum copyright notice and copyright disclosure—restricting the subsequent transmission of the material.  *Id.* ¶ 7.  Third, Mr. Downey met with Bloomberg representatives to ask that the copyright violations stop—and was rebuffed.  *Id.* ¶ 13.  Fourth, Bloomberg is well aware of the copyright laws—as it routinely enforces its own copyright protections in similar situations.  *Id.* ¶ 21.

The third element of the contributory copyright infringement claim—that the defendant substantially participated in the infringing activity—is established by Bloomberg's persistent, regular, continuing, and direct requests to Capitol Forum subscribers to transmit to it the copyrighted reports, and by Bloomberg's refusal to stop inducing infringement of Capitol Forum's copyright.  *Id.* ¶¶ 11-19.  This conduct goes well beyond the defendants' conduct in the file sharing cases cited above, in which the defendants simply provided the means to infringe.  And unlike many of the file sharing cases, in this case there is a direct relationship between the infringing activity and the business of the defendant.  Here, the infringing activity was the transmission of the Capitol Forum publications to Bloomberg, an activity that bears a direct relationship to Bloomberg's business—the publication of market news and analyses (including news and analyses copyrighted by Capitol Forum).

While *Grokster*, *Gershwin*, *Flava, Playboy*, *BWP* and *Gordon* all teach that the "substantial participation" prong is satisfied by proof that the defendant facilitated the direct infringement by a third party, the proof of Bloomberg's participation in these copyright violations is far more extensive.  Bloomberg does not simply send out advertisements for the sale of infringing material, or ship infringing material, or encourage people to upload infringing material onto its website.  It goes significantly beyond these more common acts of inducement by personally contacting Capitol Forum subscribers with specific requests to transmit copyrighted materials.  And it does so in exchange for other market information.  Bloomberg's conduct in this regard transcends the conduct of the defendants in every reported contributory infringement case.

### C.  The First Amendment is No Defense to Copyright Infringement

Because Bloomberg cannot dispute the fact that it has solicited and induced Capitol Forum subscribers to commit copyright violations, it now tries to defend this conduct by raising a supposed First Amendment privilege, described as the "right to exchange information and documents with sources in the service of newsgathering."  *See* Dkt. 12-1 at p. 2.

However, a First Amendment shield against copyright infringement has never been recognized by any court or commentator—and has been soundly rejected by every court to consider it.  The law is clear: the First Amendment does not protect copyright infringement—and cannot be invoked to impinge upon intellectual property rights.  Since the Supreme Court's decision in *Harper & Row, supra,* the courts have uniformly and consistently rejected First Amendment challenges to copyright infringement actions.  *See Cable/Home Commc'n Corp. v. Network Prods., Inc.,* 902 F.2d 829, 849 (11th Cir. 1990) (with respect to copyright protection, "[t]he first amendment is not a license to trammel on legally recognized rights in intellectual

property."); *Hard Drive Prods.,* 892 F. Supp. 2d at 338 ("the First Amendment's protection is

not absolute and does not extend to copyright infringement."); *Call of the Wild Movie,* 770 F.

Supp. 2d at 349 ("[c]opyright infringement is not protected by the First Amendment."); *Sony

Music Entm't Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 563 (S.D.N.Y. 2004) ("[p]arties may not

use the First Amendment to encroach upon the intellectual property rights of others.");

*Reimerdes,* 82 F.Supp.2d at 220 (the "Supreme Court . . . has made it unmistakably clear that the

First Amendment does not shield copyright infringement").

    In *Eldred v. Reno*, the D.C. Circuit went so far as to state that "copyrights are

categorically immune from challenges under the First Amendment." 239 F.3d 372, 375 (D.C.

Cir. 2001), *aff'd sub nom. Eldred v. Ashcroft*, 537 U.S. 186 (2003).  While the Supreme Court

observed that the categorical nature of this statement was overly broad, it nevertheless affirmed

the decision and concluded that "when . . . Congress has not altered the traditional contours of

copyright protection, further First Amendment scrutiny is unnecessary." *Eldred v. Ashcroft*, 537

U.S. 186, 221 (2003).

    In so doing, the *Eldred* Court explained that copyright law already contains "built-in First

Amendment accommodations," which are recognized through the fair use doctrine and the

dichotomy between ideas and expression (making only the latter eligible for copyright

protection).  Copyright law and the First Amendment must be viewed to exist in harmony: "[t]he

Copyright Clause and First Amendment were adopted close in time. This proximity indicates

that, in the Framers' view, copyright's limited monopolies are compatible with free speech

principles.  Indeed, copyright's purpose is to *promote* the creation and publication of free

expression."  537 U.S. at 219.

The law is thus clear that any concerns relating to free speech and free expression are fully accommodated by the fair use doctrine—and, conversely, anything outside the fair use exception is not protected by the First Amendment.  As the court stated in *Reimerdes*, "[t]o the extent there is any tension between free speech and protection of copyright, the Court has found it to be accommodated fully by traditional fair use doctrine, with expression prohibited by the Copyright Act and not within the fair use exception considered unprotected by the First Amendment."  82 F.Supp.2d at 220; *see also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,* 166 F.3d 65, 74 (2d Cir. 1999) ("[w]e have repeatedly rejected First Amendment challenges to injunctions from copyright infringement on the ground that First Amendment concerns are protected by and coextensive with the fair use doctrine."); *New Era Publications Int'l, ApS v. Henry Holt & Co.,* 873 F.2d 576, 584 (2d Cir. 1989) ("[w]e are not persuaded . . . that any first amendment concerns not accommodated by the Copyright Act are implicated . . . . Our observation that the fair use doctrine encompasses all claims of first amendment in the copyright field . . . never has been repudiated."); *United Video, Inc. v. F.C.C.,* 890 F.2d 1173, 1191 (D.C. Cir. 1989) ("the familiar idea/expression dichotomy of copyright law, under which ideas are free but their particular expression can be copyrighted, has always been held to give adequate protection to free expression."); *Luck's Music Library, Inc. v. Ashcroft,* 321 F. Supp. 2d 107, 118-19 (D.D.C. 2004), *aff'd sub nom., Luck's Music Library, Inc. v. Gonzales,* 407 F.3d 1262 (D.C. Cir. 2005) (same citing *Eldred*).

Bloomberg's argument that the First Amendment somehow protects contributory infringement sidesteps this consistent precedent, and instead rests upon a few cases that have fashioned a journalistic privilege in certain instances.  Dkt. 12-1 pp. 9-11.  But not one of these cases involves copyright protections, and in any event, all of these cases make it clear that any

16

journalistic privilege exists only if the material at issue is "lawfully obtained."  *Smith,* 443 U.S. at 105-106 (where the holding of the case was "narrow" and the "issue [was] simply the power of a state to punish the truthful publication of an alleged juvenile delinquent's name ***lawfully*** obtained by a newspaper" in violation of a criminal statute.) (emphasis added); *Landmark Commc'ns, Inc. v. Virginia,* 435 U.S. 829, 837 (1978) (where the question was "whether the First Amendment permits the criminal punishment of third persons who are strangers to the inquiry, including the news media, for divulging or publishing truthful information regarding confidential proceedings of the Judicial Inquiry and Review Commission" and noting that the court was not "concerned with the possible applicability of the statute to one who secures the information by ***illegal*** means and thereafter divulges it.") (emphasis added); *Seminole Tribe of Fla. v. Times Pub. Co.,* 780 So. 2d 310, 316 (Fla. Dist. Ct. App. 2001) (tortious interference case citing *Smith* and noting that the United States Supreme Court has articulated the "limited First Amendment principle" that "if a newspaper ***lawfully*** obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.") (emphasis added); *Anti-Defamation League of B'nai B'rith v. Superior Court,* 67 Cal. App. 4th 1072, 1093 (1998) (invasion of privacy claim where the problem related not so much to the manner in which petitioners may have *obtained* the information in question, but the manner in which they may have *used and disseminated* that information.); *Nicholson v. McClatchy Newspapers*, 177 Cal. App. 3d 509, 512-13 (Ct. App. 1986) (involving invasion of privacy claim and agreeing "that illegal conduct by a reporter is not privileged simply because the ultimate purpose is to obtain information to publish.").  As such, not one of these cases bear remotely on the situation presented here, given

that they have nothing to do with copyright law, and because the copyrighted material in this case was not obtained legally.

### D.  Bloomberg "Substantially Participated" in the Infringing Activities

In the alternative, Bloomberg argues that it did not contributorily infringe Capitol Forum's copyright protections because its activities did not rise to "the level of substantial participation" required.  Dkt. 12-1 at 13.  This alternative argument ignores the nature and extent of what Mr. Fineman actually did.  Mr. Fineman did not simply provide the Capitol Forum subscribers with the "opportunity" or "means" to infringe, which was the extent of the defendants' conduct in the cases Bloomberg relies upon for this argument.  Nor did Mr. Fineman simply provide his sources with access to copyrighted documents as Bloomberg suggests.  *See* Dkt. 12-1 at 14.  In this case, Mr. Fineman took affirmative steps to contact, solicit, and induce the Capitol Forum subscribers to send him the Capitol Forum publications, and the solicitation of others to commit copyright violations is the "classic instance of inducement." *Grokster,* 545 U.S. at 916, 937 (emphasis added).

Bloomberg's further assertion that it did not "substantially participate" in the infringement because there was no relationship between its activities and the infringing activities, citing *Newborn*, is non-sensical.  *See* Dkt. 12-1 at 13.  This matter does not involve an electronic file sharing system where there may be a tenuous relationship between the business of the defendant and the infringing activities.  In this case, there is a direct and critical link between Bloomberg's business and the infringing activities:  Bloomberg is a publisher, and it has been sourcing its stories illegally from the Capitol Forum subscribers.

Finally, we must address Bloomberg's statement that it is unaware of any journalist being held liable for sending and receiving copyrighted documents.  *See* Dkt. 12-1 at 11.  Even if that

is true, there is a good reason for it: most journalists, and certainly responsible journalists, do not

solicit and induce copyright infringements.  That is also the reason that the recent case law on

this type of activity generally involves pornographic magazines and salacious websites.  *See,*

*e.g., Flava Works,* 689 F.3d 754; *Balsley v. L.F.P., Inc.,* No. 1:08-cv-491, 2008 WL 11378897

(N.D. Ohio Dec. 2, 2008); *Playboy Enterprises,* 982 F. Supp. 503.  The simple fact of the matter

is that responsible journalists do not behave in this fashion, and in that regard we note that

Bloomberg has yet to come forward with any evidence for its claim that the solicitation of

copyrighted material is a "routine journalistic practice."

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's' Motion for Partial Summary Judgment should be

granted.

Dated:   Washington, DC
         March 4, 2020

Respectfully submitted,


By: */s/ John B. Williams*
    John B. Williams (DC Bar #257667)
    Fara N. Kitton (DC Bar #1007793)
    WILLIAMS LOPATTO PLLC
    1200 New Hampshire Ave., NW, Ste. 750
    Washington, DC  20036
    Tel.: (202) 296-1611
    jbwilliams@williamslopatto.com

    Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2020, a true and correct copy of Plaintiff's Memorandum of Law in Support of its Motion for Partial Summary Judgment was filed electronically with the Clerk of Court for the United States District Court for the District of Columbia using the CM/ECF system, which sent notification of such filing to Plaintiff's counsel of record:

> Tara M. Lee, Esq. (taralee@quinnemanuel.com)
> Quinn Emanuel Urquhart & Sullivan, LLP
> 1300 I St. NW, Suite 900
> Washington, D.C. 20005
>
> Robert L. Raskopf (robertraskopf@quinnemanuel.com)
> Jessica A. Rose (jessicarose@quinnemanuel.com)
> Quinn Emanuel Urquhart & Sullivan, LLP
> 51 Madison Ave., 22nd Floor
> New York, New York 10010

_/s/ John B. Williams_
John B. Williams