# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

DBW PARTNERS, LLC                         :
d/b/a THE CAPITOL FORUM,                  :
                                     :    Case No.: 19-cv-3715-RBW
          Plaintiff,               :
                                       :
            v.                     :
                                       :
BLOOMBERG, L.P. and                       :
BLOOMBERG FINANCE, L.P.,                  :
                                       :
          Defendants.               :

---

## DECLARATION OF THEODORE JONATHAN DOWNEY

I, Theodore Jonathan Downey, pursuant to 28.U.S.C. §1746, hereby declare:

1.   My name is Theodore Jonathan Downey.  I am the Chief Executive Officer of DBW Partners, LLC, doing business as The Capitol Forum.  I make this declaration upon personal knowledge.

2.   Capitol Forum is an investigative news and analysis company, in the business of providing time-sensitive and in-depth reports to its subscribers, including investors, industry stakeholders, law firms and policymakers.  Capitol Forum was founded in 2012 and publishes a premium internet-based subscription service, releasing anywhere between 30 and 50 reports each month on matters relating to mergers and acquisitions, consumer protection, government contracts, corporate investigations, and antitrust enforcement.  Capitol Forum's reports are extensively researched and carefully written, often the product of months of work, and its subscribers rely on these reports to make investment and business decisions.  Given the respected nature of Capitol Forum and its journalists, the release of its reports will often affect the price of

publicly traded stocks—and will do so in a matter of minutes.

3.   Capitol Forum's reports constitute a fundamental and competitively significant component of its business.  Capitol Forum owns the copyrights on all of its publications and its copyrights are duly registered with the United States Patent and Copyright Office.  Copies of the copyright registrations are attached as Exhibit A.   The Capitol Forum reports are provided only to its subscribers and to other authorized recipients.  All subscribers must sign a subscription agreement in which they agree not to transmit or reproduce the copyrighted material. A copy of that agreement is attached as Exhibit B.  Moreover, each Capitol Forum report contains a copyright notice and disclosure stating that its contents may not be distributed or reproduced without Capitol Forum's permission:

> © 2017 by the Capitol Forum.  The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum.   Recipients shall not directly, or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from the Capitol Forum.  Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

*See, e.g.,* Exhibit C.

4.   Bloomberg is one of Capitol Forum's competitors and holds a dominant position in the financial information industry.  Virtually all professional financial market participants subscribe to a Bloomberg "terminal," providing them with access to a number of products, including its "First Word" service which focuses on time-sensitive market developments.  While both Capitol Forum and First Word provide subscription services to the financial market, their business models are significantly different.  Capitol Forum invests heavily in extensive market research and first-hand interviews with market participants and will provide lengthy and in-depth analyses to its subscribers.  First Word, on the other hand, will generally obtain its information

from its competitors, including Capitol Forum, which it will quickly repackage and republish to its subscribers.  Bloomberg is not an authorized recipient of Capitol Forum's copyrighted material.

5.  When Capitol Forum began operations, and before it applied for copyright protection, it would send some of its articles to Mr. Fineman, a reporter for Bloomberg's First Word service, as it generated exposure for the company.  As Capitol Forum became more recognized in the financial community, and as our subscribers began expressing concern that its material was also appearing on Bloomberg's First Word service, I informed Mr. Fineman in May 2013 that Capitol Forum would no longer forward or share its reports with Bloomberg.

6.  Mr. Fineman soon found another source for the Capitol Forum articles:  Capitol Forum's subscribers.  Even after Capitol Forum received its copyright registration in 2016, and our articles contained copyright disclosures stating that transmission and copying of the articles was forbidden, Mr. Fineman continued to solicit Capitol Forum subscribers and continued to repackage and republish its copyrighted material.

7.  In April 2017, I travelled to New York to meet with Mr. Fineman and his First Word editor, Arie Shapira.  I informed them that Capitol Forum objected to their solicitation of our subscribers and asked them to stop.  I suggested that if they needed particular information for a particular purpose, they should contact me directly and I would consider the request.  Mr. Fineman and Mr. Shapira laughed at this suggestion.  I then questioned the legality of obtaining the Capitol Forum material through its subscribers.  In response, they admitted that Mr. Fineman had contacted Capitol Forum subscribers to ask for and to obtain our articles, and that this practice, which I assumed was used to obtain information from other publishers as well, had proven to be very successful for the First Word "business model."

8.   Despite my request that this practice stop, Mr. Fineman continued to solicit Capitol Forum subscribers and continued to repackage and republish Capitol Forum's material.  An example is set forth below, demonstrating the sequence of transmission of Capitol Forum articles to Mr. Fineman.  In particular:

a.   At 11:00 a.m. (Eastern) on August 22, 2017, Capitol Forum transmitted a copyrighted article report to one of its subscribers, to his business e-mail address.  *See* Exhibit C.

b.   This Capitol Forum report, like all Capitol Forum reports, includes the following copyright notice:

© 2017 by the Capitol Forum.  The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum.   Recipients shall not directly, or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum.  Unauthorized reproduction or distribution is a violation of Federal Copyright Law.  *Id.*

c.   At 11:17 a.m. that day, the subscriber transmitted the Capitol Forum report to Mr. Fineman, using his gmail address rather than his business e-mail address.  *Id.*

d.   At 11:18 a.m. that day, Mr. Fineman acknowledged the receipt of the transmission of the Capitol Forum article by responding "TKS" to the subscriber's gmail address.  *Id.*

e.   At 11:36 a.m. that day, Bloomberg repackaged and republished the Capitol Forum report, highlighting and quoting essential points of the article.  *See* Exhibit D.

9.   In December 2017, Capitol Forum discovered the identity of a subscriber, a West Coast hedge fund, which had been asked by Mr. Fineman for our articles and had provided them to him.  I contacted the hedge fund manager and asked if he had been sending articles to Mr. Fineman.  The manager replied:

I'm sorry—yes, I have shared some articles with him.  He had done me favors by getting me access to stuff I didn't have, but I should not have sent him anything of yours without your permission.  I am

really sorry about this—it will not happen again.

A copy of that email exchange is attached as Exhibit E.

10. In a subsequent email, the hedge fund manager explained to me his interactions with

Mr. Fineman:

> Josh would typically reach out to me over the course of 2017 via Bloomberg chat to see if I had a story.  If I did, and again I feel TERRIBLE about this, I would *sometimes* (not always) forward it [to] him—although all of this stopped when you contacted me in December 2017.

*See* Exhibit F.

11. In the same email, the manager went on to describe and forward another instance

in which Mr. Fineman had approached him, this one involving an article from a publication other

than Capitol Forum.

12. This hedge fund manager also provided Capitol Forum with five instances in which

he forwarded our publications to Bloomberg.  *See* Exhibits C, G, H, I, J.  While the hedge fund

manager referenced above apparently stopped sending Capitol Forum material to Bloomberg

after December 2017, Mr. Fineman soon found another subscriber (or subscribers) to send him

the Capitol Forum articles.

13.  Since December 2017, Bloomberg has received and republished over 40 Capitol

Forum copyrighted articles.  Between June 2016, when Capitol Forum obtained its copyright

registration and December 2018, Bloomberg has solicited and received at least 103 copyrighted

Capitol Forum articles from Capitol Forum subscribers.  These publications are identified in

Exhibit K.  Each one of these publications was copyrighted and bore the same copyright

disclosure and warning set forth in paragraph 3 above.  These publications were solicited and

received by Bloomberg on the dates reflected in Exhibit K.   No solicitation or transmission of

these articles was permitted by Capitol Forum.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of March 2020 in the District of Columbia.

Theodore Jonathan Downey

# Exhibit A

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay H. Tesle*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-627-681**

**Effective Date of Registration:**
October 12, 2018

## Title

| | |
|---|---|
| **Title of Work:** | The Capitol Forum |
| **City/State:** | Washington, DC |
| **Month/Year:** | September 2018 |

## Completion/Publication

| | |
|---|---|
| **Publication Date of First Issue:** | September 04, 2018 |
| **Publication Date of Last Issue:** | September 28, 2018 |
| **Nation of 1st Publication:** | United States |
| **Number of Issues in this Group:** | 18 |

## Author

| | |
|---|---|
| • **Author:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Author Created:** | contribution(s) by the same author and claimant |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | DBW Partners LLC d/b/a The Capitol Forum |
| | 1200 New Hampshire Ave. NW, Suite 750, Washington, DC, 20036, United States |

## Certification

| | |
|---|---|
| **Name:** | Trevor Baine |
| **Date:** | October 12, 2018 |

Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Leslie*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-627-714**

**Effective Date of Registration:**
September 21, 2018

## Title

| | |
|---|---|
| **Title of Work:** | The Capitol Forum |
| **City/State:** | Washington, DC |
| **Month/Year:** | August 2018 |

## Completion/Publication

| | |
|---|---|
| **Publication Date of First Issue:** | August 01, 2018 |
| **Publication Date of Last Issue:** | August 31, 2018 |
| **Nation of 1st Publication:** | United States |
| **Number of Issues in this Group:** | 19 |

## Author

| | |
|---|---|
| • **Author:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Author Created:** | contribution(s) by the same author and claimant |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | DBW Partners LLC d/b/a The Capitol Forum |
| | 1200 New Hampshire Ave. NW, Suite 750, Washington, DC, 20036, United States |

## Rights and Permissions

| | |
|---|---|
| **Organization Name:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Name:** | Trevor Baine |
| **Email:** | tbaine@thecapitolforum.com |
| **Telephone:** | (202)601-2304 |
| **Alt. Phone:** | (202)601-2300 |
| **Address:** | 1200 New Hampshire Ave. NW |
| | Suite 750 |
| | Washington, DC 20036 United States |

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

**Registration Number**

## TX 8-629-234

**Effective Date of Registration:**
August 17, 2018

*Kary H. Tisle*

Acting United States Register of Copyrights and Director

## Title

|  |  |
|---|---|
| **Title of Work:** | The Capitol Forum |
| **City/State:** | Washington, DC |
| **Month/Year:** | July 2018 |

## Completion/Publication

|  |  |
|---|---|
| **Publication Date of First Issue:** | July 02, 2018 |
| **Publication Date of Last Issue:** | July 30, 2018 |
| **Nation of 1st Publication:** | United States |
| **Number of Issues in this Group:** | 13 |

## Author

|  |  |
|---|---|
| **Author:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Author Created:** | contribution(s) by the same author and claimant |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant

|  |  |
|---|---|
| **Copyright Claimant:** | DBW Partners LLC d/b/a The Capitol Forum |
| | 1233 20th Street NW #301, Washington, DC, 20036, United States |

## Certification

|  |  |
|---|---|
| **Name:** | Trevor Baine |
| **Date:** | August 17, 2018 |

|  |  |
|---|---|
| **Correspondence:** | Yes |

Page 1 of 1

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay H. Lugle*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-627-630

**Effective Date of Registration:**
July 13, 2018

---

## Title

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** June 2018

## Completion/Publication

**Publication Date of First Issue:** June 01, 2018
**Publication Date of Last Issue:** June 29, 2018
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 20

## Author

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Certification

**Name:** Trevor Baine
**Date:** July 13, 2018

---

Page 1 of 1

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Kay A. Tingle*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-627-615

**Effective Date of Registration:**
June 08, 2018

---

## Title

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** May 2018

## Completion/Publication

**Publication Date of First Issue:** May 01, 2018
**Publication Date of Last Issue:** May 31, 2018
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 19

## Author

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
**Author Created:** contribution(s) by the same author and claimant
**Work made for hire:** Yes
**Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Certification

**Name:** Trevor Baine
**Date:** June 08, 2018

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Keny A. Tingle*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-627-602

**Effective Date of Registration:**
May 11, 2018

---

## Title

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** April 2018

## Completion/Publication

**Publication Date of First Issue:** April 02, 2018
**Publication Date of Last Issue:** April 30, 2018
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 21

## Author

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Certification

**Name:** Trevor Baine
**Date:** May 11, 2018

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Tugle*

Acting United States Register of Copyrights and Director

**Registration Number**
## TX 8-627-584
**Effective Date of Registration:**
April 04, 2018

---

## Title

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** March 2018

## Completion/Publication

**Publication Date of First Issue:** March 01, 2018
**Publication Date of Last Issue:** March 30, 2018
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 18

## Author

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Certification

**Name:** Trevor Baine
**Date:** April 04, 2018

---

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Kay A. Lingle*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-627-562**

**Effective Date of Registration:**
March 07, 2018

## Title _____

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** February 2018

## Completion/Publication _____

**Publication Date of First Issue:** February 01, 2018
**Publication Date of Last Issue:** February 28, 2018
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 18

## Author _____

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant _____

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Certification _____

**Name:** Trevor Baine
**Date:** March 07, 2018

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Karyn A. Temple*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-627-541

**Effective Date of Registration:**
February 05, 2018

---

## Title

| | |
|---|---|
| **Title of Work:** | The Capitol Forum |
| **City/State:** | Washington, DC |
| **Month/Year:** | January 2018 |

## Completion/Publication

| | |
|---|---|
| **Publication Date of First Issue:** | January 02, 2018 |
| **Publication Date of Last Issue:** | January 31, 2018 |
| **Nation of 1st Publication:** | United States |
| **Number of Issues in this Group:** | 17 |

## Author

| | |
|---|---|
| • **Author:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Author Created:** | contribution(s) by the same author and claimant |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | DBW Partners LLC d/b/a The Capitol Forum |
| | 1233 20th Street NW #301, Washington, DC, 20036, United States |

## Certification

| | |
|---|---|
| **Name:** | Trevor Baine |
| **Date:** | February 05, 2018 |

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Leigh*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-627-501

**Effective Date of Registration:**
December 04, 2017

---

## Title

| | |
|---|---|
| **Title of Work:** | The Capitol Forum |
| **City/State:** | Washington, DC |
| **Month/Year:** | November 2017 |

## Completion/Publication

| | |
|---|---|
| **Publication Date of First Issue:** | November 01, 2017 |
| **Publication Date of Last Issue:** | November 30, 2017 |
| **Nation of 1st Publication:** | United States |
| **Number of Issues in this Group:** | 18 |

## Author

| | |
|---|---|
| • **Author:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Author Created:** | contribution(s) by the same author and claimant |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | DBW Partners LLC d/b/a The Capitol Forum |
| | 1233 20th Street NW #301, Washington, DC, 20036, United States |

## Certification

| | |
|---|---|
| **Name:** | Trevor Baine |
| **Date:** | December 04, 2017 |

---

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Twila*

Acting United States Register of Copyrights and Director

**Registration Number**
**TX 8-629-242**
**Effective Date of Registration:**
November 02, 2017

---

## Title

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** October 2017

## Completion/Publication

**Publication Date of First Issue:** October 02, 2017
**Publication Date of Last Issue:** October 31, 2017
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 18

## Author

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Certification

**Name:** Trevor Baine
**Date:** November 02, 2017

---

**Correspondence:** Yes

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

**Registration Number**

## TX 8-627-297

**Effective Date of Registration:**
October 09, 2017

*Kay A. Teagle*

Acting United States Register of Copyrights and Director

---

## Title

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** September 2017

## Completion/Publication

**Publication Date of First Issue:** September 01, 2017
**Publication Date of Last Issue:** September 29, 2017
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 15

## Author

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Rights and Permissions

**Organization Name:** DBW Partners LLC d/b/a The Capitol Forum
**Name:** Trevor Baine
**Email:** tbaine@thecapitolforum.com
**Telephone:** (202)601-2304
**Alt. Phone:** (202)601-2300
**Address:** 1233 20th Street NW #301
Washington, DC 20036 United States

## Certification

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Tesla*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-625-741**

**Effective Date of Registration:**
October 05, 2017

---

## Title _____

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** August 2017

## Completion/Publication _____

**Publication Date of First Issue:** August 01, 2017
**Publication Date of Last Issue:** August 30, 2017
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 20

## Author _____

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant _____

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Rights and Permissions _____

**Organization Name:** DBW Partners LLC d/b/a The Capitol Forum
**Name:** Trevor Baine
**Email:** tbaine@thecapitolforum.com
**Telephone:** (202)601-2304
**Alt. Phone:** (202)601-2300
**Address:** 1233 20th Street NW #301
Washington, DC 20036 United States

## Certification _____

Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay Leigh Clayyth*

Acting United States Register of Copyrights and Director

**Registration Number**

# TX 8-476-563

**Effective Date of Registration:**
August 23, 2017

---

## Title

| | |
|---|---|
| **Title of Work:** | The Capitol Forum |
| **City/State:** | Washington, DC |
| **Month/Year:** | July 2017 |

## Completion/Publication

| | |
|---|---|
| **Publication Date of First Issue:** | July 03, 2017 |
| **Publication Date of Last Issue:** | July 31, 2017 |
| **Nation of 1st Publication:** | United States |
| **Number of Issues in this Group:** | 18 |

## Author

| | |
|---|---|
| • **Author:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Author Created:** | contribution(s) by the same author and claimant |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | DBW Partners LLC d/b/a The Capitol Forum |
| | 1233 20th Street NW #301, Washington, DC, 20036, United States |

## Certification

| | |
|---|---|
| **Name:** | Trevor Baine |
| **Date:** | August 23, 2017 |

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

Kay Leigh Clapeth

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-476-604

**Effective Date of Registration:**
July 13, 2017

---

## Title

| | |
|---|---|
| **Title of Work:** | The Capitol Forum |
| **City/State:** | Washington, DC |
| **Month/Year:** | June 2017 |

## Completion/Publication

| | |
|---|---|
| **Publication Date of First Issue:** | June 01, 2017 |
| **Publication Date of Last Issue:** | June 30, 2017 |
| **Nation of 1st Publication:** | United States |
| **Number of Issues in this Group:** | 19 |

## Author

| | |
|---|---|
| • **Author:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Author Created:** | contribution(s) by the same author and claimant |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | DBW Partners LLC d/b/a The Capitol Forum |
| | 1233 20th Street NW #301, Washington, DC, 20036, United States |

## Certification

| | |
|---|---|
| **Name:** | Trevor Baine |
| **Date**: | July 13, 2017 |

---

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Karyn Temple Claggett*

Acting United States Register of Copyrights and Director

**Registration Number**

# TX 8-475-971

**Effective Date of Registration:**
July 13, 2017

---

## Title

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** May 2017

## Completion/Publication

**Publication Date of First Issue:** May 03, 2017
**Publication Date of Last Issue:** May 31, 2017
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 20

## Author

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Certification

**Name:** Trevor Baine
**Date:** June 09, 2017

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Kaya Teyle Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-476-046

**Effective Date of Registration:**
May 17, 2017

---

## Title

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** April 2017

## Completion/Publication

**Publication Date of First Issue:** April 03, 2017
**Publication Date of Last Issue:** April 28, 2017
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 15

## Author

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Certification

**Name:** Trevor Baine
**Date:** May 17, 2017

---

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Kayn Tayle Claytt*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-476-004**

**Effective Date of Registration:**
April 10, 2017

## Title _____

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** March 2017

## Completion/Publication _____

**Publication Date of First Issue:** March 01, 2017
**Publication Date of Last Issue:** March 31, 2017
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 20

## Author _____

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant _____

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Certification _____

**Name:** Trevor Baine
**Date:** April 10, 2017

## Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Tayle Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**
# TX 8-476-178
**Effective Date of Registration:**
March 20, 2017

---

### Title

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** February 2017

### Completion/Publication

**Publication Date of First Issue:** February 01, 2017
**Publication Date of Last Issue:** February 28, 2017
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 18

---

### Author

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

### Copyright Claimant

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

---

### Certification

**Name:** Trevor Baine
**Date:** March 20, 2017

---

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Tayle Clagett*

Acting United States Register of Copyrights and Director

**Registration Number**
**TX 8-476-156**

**Effective Date of Registration:**
February 15, 2017

## Title _____

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** January 2017

## Completion/Publication _____

**Publication Date of First Issue:** January 03, 2017
**Publication Date of Last Issue:** January 31, 2017
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 17

## Author _____

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant _____

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Certification _____

**Name:** Trevor Baine
**Date:** February 15, 2017

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Leigh Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-410-546**

**Effective Date of Registration:**
January 04, 2017

## Title

**Title of Work:** The Capitol Forum

**City/State:** Washington, DC
**Month/Year:** December 2016

## Completion/Publication

**Publication Date of First Issue:** December 01, 2016
**Publication Date of Last Issue:** December 29, 2016
**Nation of 1st Publication:** United States
**Number of Issues in this Group:** 17

## Author

- **Author:** DBW Partners LLC d/b/a The Capitol Forum
  **Author Created:** contribution(s) by the same author and claimant
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** DBW Partners LLC d/b/a The Capitol Forum
1233 20th Street NW #301, Washington, DC, 20036, United States

## Certification

**Name:** Malka Zeefe
**Date:** January 04, 2017

**Correspondence:** Yes

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Karyn Temple Claggett*

Acting United States Register of Copyrights and Director

Registration Number

## TX 8-410-534

**Effective Date of Registration:**
December 22, 2016

## Title

| | |
|---|---|
| **Title of Work:** | The Capitol Forum |
| **City/State:** | Washington, DC |
| **Month/Year:** | November 2016 |

## Completion/Publication

| | |
|---|---|
| **Publication Date of First Issue:** | November 01, 2016 |
| **Publication Date of Last Issue:** | November 30, 2016 |
| **Nation of 1st Publication:** | United States |
| **Number of Issues in this Group:** | 18 |

## Author

| | |
|---|---|
| • **Author:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Author Created:** | contribution(s) by the same author and claimant |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | DBW Partners LLC d/b/a The Capitol Forum |
| | 1233 20th Street NW #301, Washington, DC, 20036, United States |

## Certification

| | |
|---|---|
| **Name:** | Malka Zeefe |
| **Date:** | December 22, 2016 |

| | |
|---|---|
| **Correspondence:** | Yes |

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Teigh Clapett*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-393-831**

**Effective Date of Registration:**
November 16, 2016

---

## Title

| | |
|---|---|
| **Title of Work:** | The Capitol Forum |
| **City/State:** | Washington, DC |
| **Month/Year:** | October 2016 |

## Completion/Publication

| | |
|---|---|
| **Publication Date of First Issue:** | October 03, 2016 |
| **Publication Date of Last Issue:** | October 31, 2016 |
| **Nation of 1st Publication:** | United States |
| **Number of Issues in this Group:** | 16 |

## Author

| | |
|---|---|
| • **Author:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Author Created:** | contribution(s) by the same author and claimant |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | DBW Partners LLC d/b/a The Capitol Forum |
| | 1233 20th Street NW #301, Washington, DC, 20036, United States |

## Certification

| | |
|---|---|
| **Name:** | Malka Zeefe |
| **Date:** | November 16, 2016 |

---

| | |
|---|---|
| **Correspondence:** | Yes |

Page 1 of 1

## Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Teyle Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-393-845**

**Effective Date of Registration:**
October 03, 2016

## Title _____

| | |
|---|---|
| **Title of Work:** | The Capitol Forum |
| **City/State:** | Washington, DC |
| **Month/Year:** | September 2016 |

## Completion/Publication _____

| | |
|---|---|
| **Publication Date of First Issue:** | September 01, 2016 |
| **Publication Date of Last Issue:** | September 30, 2016 |
| **Nation of 1st Publication:** | United States |
| **Number of Issues in this Group:** | 17 |

## Author _____

| | |
|---|---|
| • **Author:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Author Created:** | contribution(s) by the same author and claimant |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant _____

| | |
|---|---|
| **Copyright Claimant:** | DBW Partners LLC d/b/a The Capitol Forum |
| | 1233 20th Street NW #301, Washington, DC, 20036, United States |

## Certification _____

| | |
|---|---|
| **Name:** | Malka Zeefe |
| **Date:** | October 03, 2016 |

| | |
|---|---|
| **Correspondence:** | Yes |

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Tyle Clyett*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-459-175**

**Effective Date of Registration:**
August 30, 2016

---

## Title

| | |
|---|---|
| **Title of Work:** | The Capitol Forum |
| **City/State:** | Washington, DC |
| **Month/Year:** | July 2016 |

## Completion/Publication

| | |
|---|---|
| **Publication Date of First Issue:** | July 01, 2016 |
| **Publication Date of Last Issue:** | July 28, 2016 |
| **Nation of 1st Publication:** | United States |
| **Number of Issues in this Group:** | 19 |

## Author

| | |
|---|---|
| • **Author:** | DBW Partners LLC d/b/a The Capitol Forum |
| **Author Created:** | contribution(s) by the same author and claimant |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | DBW Partners LLC d/b/a The Capitol Forum |
| | 1233 20th Street NW #301, Washington, DC, 20036, United States |

## Certification

| | |
|---|---|
| **Name:** | Jay Hunter |
| **Date:** | August 30, 2016 |

---

# Exhibit B

**THE CAPITOL FORUM**
**SUBSCRIPTION AGREEMENT**

This Subscription Agreement is entered into as of the date listed below by and between the subscriber listed below ("**Subscriber Organization**") and The Capitol Forum. Upon execution, this Agreement will amend, restate and supersede in its entirety the prior Subscription Agreement entered into between Subscriber Organization and The Capitol Forum.

**1.      GRANT OF AUTHORITY.**      Subscriber Organization acknowledges that the contents of The Capitol Forum are copyrighted by The Capitol Forum or its licensors. This Agreement grants Subscriber Organization a limited, non-exclusive, revocable, nontransferable, non-assignable worldwide license to access The Capitol Forum content. This license permits only the individual Users identified in Appendix A to this Agreement to access The Capitol Forum content. Each such User may view The Capitol Forum content on a computer or similar device and may print one paper copy for their individual use. Copies created as part of the normal background operation of a computer system and not normally viewed (e.g., system back-up) are permissible. Except as provided above, no copying or distribution in any media is authorized. Thus, forwarding content electronically is prohibited; posting content on an intranet or website is prohibited, and otherwise providing content to non-Users is prohibited.

**2.      MONITORING.**  To monitor electronic delivery accuracy and copyright compliance, The Capitol Forum may use electronic delivery software, which may forward certain technical data and newsletter usage information from any computer that opens the newsletter email to The Capitol Forum.  The Capitol Forum will not share this information with anyone outside the company, nor will The Capitol Forum use it for any commercial purpose.

**3.      PAYMENT TERMS.**  Subscriber Organization shall be billed annually, in advance, in an amount equal to the twelve-month subscription price specified in Appendix A.  Payment shall be due upon receipt of the invoice. Accounts not paid within 30 days of the invoice date shall be considered delinquent, in which case The Capitol Forum shall have the right to suspend provision of content without prior notice.  Subscriber Organization agrees to bear all reasonable costs (including attorneys' fees) that The Capitol Forum incurs to collect payment due hereunder.

**4.      TAXES.** This subscription may be subject to sales or use tax based on applicable laws in Subscriber Organization's state of domicile. The Capitol Forum is required to charge sales tax on subscribers located in Illinois, New York, and Washington DC. State sales tax laws and rates are subject to change. Subscriber Organization shall pay any such applicable taxes in addition to the subscription rate.

**5.      TERM AND RENEWAL**. The Capitol Forum will provide the services specified in Appendix A to Subscriber Organization for an initial term of beginning on the date shown in Appendix A.  This term shall automatically renew for the subsequent twelve-month period, unless either party provides the other party written notice of nonrenewal at least 15 days prior to expiration of the then current term.  The service fee for each renewal period will be based on the Rate in effect during the then-current term, subject to a five percent (5%) increase occurring on each anniversary of the beginning of the Initial Term.

**6.      GENERAL**. This Agreement may not be assigned or otherwise transferred by Subscriber Organization without The Capitol Forum's prior written consent.  Should any provision of this Agreement be held to be void, invalid, unenforceable or illegal, it shall be severed from this Agreement and the remaining terms shall remain in full force and effect.  This Agreement shall be governed by and construed under the laws of the District of Columbia.  All notices hereunder shall be sent, certified mail, to The Capitol Forum at 1200 New Hampshire Avenue NW, Suite 750 Washington, DC 20036 and to Subscriber Organization at the address given in this Agreement, or, by email to The Capitol Forum at tbaine@thecapitolforum.com and to Subscriber Organization at the email address provided below.

**Subscriber Organization:** _____

**Name:**  _____

**Title:**  _____

**Address:**
_____

_____

_____

**Billing Contact (if different than above)**

**Name:**  _____

**Title:**  _____

**Email:**  _____

**Phone:**  _____

**Signature:** _____

**THE CAPITOL FORUM**
**SUBSCRIPTION TERMS**

**Services Purchased:** Each Capitol Forum Subscriber Organization User will have access to the following services:

- All content from The Capitol Forum's policy reporting teams, delivered as a digital newsletter in the case of new content and provided through an online library in the case of content previously published.
- Attendance at each of The Capitol Forum's subscriber-only events and panel discussions featuring opinion leaders in private industry as well as leading lawmakers.

**Subscription Rate:** The Capitol Forum will provide the foregoing content for up to five Users for a total twelve-month subscription price of $XX,000. Sales tax will be charged on top of this price, if applicable under law.

**User List:** Subscriber Organization will specify the authorized Users and may replace one authorized User with another at any time during the subscription term.

**Initial 12-Month Term Beginning Date:** [DATE]

---

**THE CAPITOL FORUM**
**USER LIST**

| # | Name | Title | Email |
|---|------|-------|-------|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |

# Exhibit C



From: **Joshua Fineman (BLOOMBERG/ NEWSROOM:)** <jfineman@bloomberg.net>
Date: Tue, Aug 22, 2017 at 8:18 AM
Subject: Re:Fwd: Fresenius/NxStage: Hemodialysis Machine Overlap, Negative Customer Reaction, Lack of Clear Fix, Drive Antitrust Risk
To: <█████@gmail.com>

tks

From: █████████@gmail.com At: 08/22/17 11:17:39
To: JOSHUA FINEMAN (BLOOMBERG/ NEWSROOM: )
Subject: Fwd: Fresenius/NxStage: Hemodialysis Machine Overlap, Negative
Customer Reaction, Lack of Clear Fix, Drive Antitrust Risk

---------- Forwarded message ----------
From: **The Capitol Forum** <editorial@thecapitolforum.com>
Date: Tue, Aug 22, 2017 at 8:00 AM
Subject: Fresenius/NxStage: Hemodialysis Machine Overlap, Negative Customer
Reaction, Lack of Clear Fix, Drive Antitrust Risk
To: "█████████cap.com" <█████████cap.com>

Web Version | Update preferences | Unsubscribe



## Fresenius/NxStage: Hemodialysis Machine Overlap, Negative Customer Reaction, Lack of Clear Fix, Drive Antitrust Risk

*Vol. 5 No. 284 - August 22, 2017 - **Click here** to access our library.*

### Deal Update

On August 7, 2017, Fresenius Medical Care announced an agreement to acquire NxStage Medical, Inc. in an all-cash transaction valued at about $2 billion.

NxStage and Fresenius market the only two hemodialysis machines FDA-approved for home use, and interviewed dialysis provider customers express concern about the combination's impact on competition. Although the parties may contend that the Fresenius product is a competitively insignificant, distant substitute for the NxStage machine, or that entry would address competitive issues, these arguments will each face obstacles.

The transaction may also raise concerns in the broader market for hemodialysis machines, where Fresenius occupies a dominant position in-clinic. Although NxStage's share of an all-machine market is small, the company projects that home hemodialysis adoption will grow substantially. And because this growth would come primarily at Fresenius' expense, current shares may understate NxStage's future competitive significance and competitive interaction with Fresenius.

If the FTC views the deal as lessening competition in an all-hemodialysis machine market, the deal is effectively unfixable. Even a remedy to address overlap in the narrowly defined home hemodialysis machine market—presumably involving divestiture of the Fresenius 2008K@Home machine (the "Baby K")—would encounter logistical, commercial, and competitive roadblocks.

Ultimately, given structural issues in multiple relevant product markets, negative customer reaction, and a lack of a clear fix, the Fresenius/NxStage deal faces at least moderate antitrust risk.

"We are confident that [the transaction] would be procompetitive for consumers and patients," a Fresenius Medical Care spokesperson says. NxStage did not respond to a request for comment.

**In-depth: Home Hemodialysis Machine Market**

**In-center hemodialysis, peritoneal dialysis, and home hemodialysis.** Patients with end-stage renal disease (ESRD), or kidney failure, generally opt to pursue **dialysis treatment**—a typically thrice-weekly process through which a dialysis machine effectively serves as an artificial kidney.

Of the approximately 470,000 Americans currently in dialysis treatment, roughly 88% opt for in-center hemodialysis. The remaining 12% choose a home therapy—10% opt for peritoneal dialysis and 2% for home hemodialysis. Although the home hemodialysis population has grown from 0.8% of all patients in 2006, the segment remains relatively small, including fewer than 10,000 Americans.

NxStage, nonetheless, **estimates** the global home hemodialysis market at about $300 million. Despite education and reimbursement hurdles, NxStage investor materials project a 10 to 15% home hemo penetration target and an eventual market size exceeding $1 billion.

**Fresenius and NxStage market only two hemodialysis machines FDA-approved for home use.** Fresenius (2008K@Home) and NxStage (System One) manufacture and market the only two hemodialysis machines FDA-approved for use in the home setting. "For home hemo, your options are the Fresenius Baby K or the NxStage machine—they own the market," explains Richard Tagliagambe, director of purchasing at Atlantic Dialysis Management.

NxStage is the clear market leader in home hemodialysis. "NxStage probably makes up 80%, 85% of the market in the United States because it's much easier, portable, lighter—it favors patients to go home," says Robert Lockridge Jr., a former Medical Director of the University of Virginia's Lynchburg Dialysis Facility, and dialysis machine expert. Fresenius' 2008K@Home occupies the remainder of the home market. In the company's 2016 annual report, Fresenius indicates that about 22% of home hemodialysis patients worldwide use Fresenius products. However, this number may overstate Fresenius' share in the U.S. market, where, according to one industry source, the Baby K occupies just a single-digit share.

**Home hemodialysis machines are very likely a relevant product market.** Home hemodialysis machines lack any clear substitute and are very likely a relevant product market.

Although the majority of home dialysis involves peritoneal dialysis, PD is a fundamentally different form of treatment than hemodialysis, typically available to patients with some residual kidney function. As evidenced by the 90% hemodialysis adoption rate, PD is oftentimes a poor option and is a relatively short-term fix in many cases. In evaluating the issue in 2013 (Baxter/Gambro), the EC **concluded** that "a small but significant increase in the price of HD products would be unlikely to induce a significant number of customers to switch to PD to treat chronic patients, and vice-versa."

In-clinic hemodialysis machines are likewise poor options for home hemodialysis, due to size, resource usage, and lack of FDA indication for home use. In fact, interviewed industry sources do not report any home use of machines not FDA indicated for the home setting. "There are a lot of regulatory, medical, legal reasons that you wouldn't do that—you wouldn't use something that doesn't have approval," says a Chief Medical Officer of a mid-sized U.S. dialysis provider.

Put simply, a hypothetical monopolist of home hemodialysis machines could very likely raise prices profitably without substantial diversion to peritoneal dialysis or in-clinic hemodialysis machines. The

Fresenius/NxStage combination, then, may be an effective merger to monopoly in what is very likely a valid product market.

**Some negative customer reaction.** Given this market structure, some interviewed dialysis provider customers express broadly negative views of the transaction's competitive implications.

"It would be a concern for me," says Atlantic Dialysis' Richard Tagliagambe. "If one company literally dominates the entire market it makes it a little bit more difficult from a provider standpoint to keep that profit margin consistent," Tagliagambe adds.

To be clear, dialysis providers occupy an unusual position, as both customers of, and competitors to, Fresenius, which treats about 38% of U.S. dialysis patients. In fact, Fresenius' market-leading position in both machines and services could exacerbate competitive issues, as a post-merger price increase on home hemodialysis machines would benefit both the company's products segment and —by raising its dialysis provider rivals' costs—its services segment as well.

"I foresee them using this as an added advantage over the competitor," says Tagliagambe. "Those are the only two technologies, so if I'm Fresenius and I own it all and now I'm DaVita and I want to bring a patient to home dialysis, you'll need to be very creative in your approach as it opens the opportunity to drive contracts to a premium," Tagliagambe adds.

The CMO of the mid-sized U.S. dialysis provider likewise expresses concerns about the transaction. "You have two organizations that corner a market, so that's absolutely a concern as you move forward," says the CMO. "You want to make sure that there is reasonable capacity and somebody hasn't cornered the market on a product," the CMO adds.

To be clear, customer reaction to the transaction has not been universally negative. For example, on an August 9 earnings call, American Renal Associates CEO Joseph A. Carlucci said: "With regard to the transaction, I think that it might be actually good for the industry, because in my view, at least, it will—NxStage has always done a good job. We use NxStage machines for sure. But with Fresenius, I would hope that there's more capacity in the manufacturing area, which potentially could lead to better pricing in the future."

**Competitive effects: parties may argue that machines do not compete closely, Baby K competitively insignificant.** To overcome market structure and customer reaction issues, the parties will presumably rely on two arguments: competitive effects and entry.

On effects, the parties will likely argue—with some basis in fact—that although the System One and 2008K@Home are the only two hemodialysis machines FDA-approved for home use, the Fresenius 2008K@Home occupies a competitively insignificant market position, and is generally a distant substitute for the NxStage product.

Fundamentally, the Baby K is simply a slightly modified version of Fresenius' in-center 2008K² machine. The NxStage System One, by contrast, is much smaller, and sufficiently portable that home dialysis patients may travel with the device. "The technology is totally different. One is an in-center machine, made into a home machine, one is a machine that was designed totally for home dialysis," says Lockridge.

Portability issues aside, the Baby K uses bicarbonate dialysate, which requires a water treatment system and certain plumbing and electrical modifications to the home. The NxStage, by contrast, uses lactate dialysate and requires only a grounded electrical outlet, or connection to a water source and hose.

As a result, clinics and patients—including Fresenius clinic patients—largely choose the System One. And given the 2008K@Home's drawbacks, the parties may argue that the Baby K, despite its home indication, is competitively insignificant in the home market. "85% of the patients that are on home dialysis today in the Fresenius-owned patients, they're using NxStage. So that tells you right there—the people that own the machine are not even selling it or using it," Lockridge adds.

Fundamentally, the Fresenius machine occupies a relatively minor position in the home hemodialysis market. In that same respect, Fresenius continues to market the Baby K, including to non-Fresenius providers. Customer reaction is largely inconsistent with the idea that the combination would not diminish competition. And more generally, the argument that the only two products in a product market do not actually compete, or otherwise constrain one another's pricing—although plausible—is typically an uphill climb.

**Entry plausible, but timeliness, likeliness unclear.** The parties may also argue that entry to the home hemodialysis machine market would alleviate potential adverse competitive effects.

In the near-term, the most likely entrant to the home market is Outset Medical's Tablo, which is FDA-approved for clinic and hospital settings and currently in an IDE trial, seeking FDA clearance for a home indication. Outset has attracted significant funding from Warburg Pincus and others, and the Tablo is viewed as a much closer potential competitor to NxStage's System One than is the Fresenius 2008K@Home. Industry sources offer varying projections on timing for Tablo's potential entry to the market, with late 2018 viewed as the earliest window, and 2019 relatively more likely.

A second potential entrant is Quanta Dialysis Technologies, which in January 2015 won a CE mark (EU) for its SC+ product in the home setting. Although the SC+ is currently in commercial use in the United Kingdom, and the EU approval could expedite the FDA process, the company does not appear to have publicly announced, or taken concrete steps toward, U.S. entry. Quanta's entry in the U.S. market, even with the benefit of a CE mark, would likely be a two-year proposition, at least.

In a highly regulated industry with unclear commercial prospects, however, entry is never a fait accompli—even with the benefit of ex-U.S. regulatory approval or ongoing U.S. clinical trials. Baxter, for example, won a CE mark for its Vivia home hemodialysis machine in December 2013, and it began U.S. clinical trials on the product in March 2016. Just three months later, however, the company **announced** that it would abandon U.S. entry and exit the European market, given reliability and cash flow issues.

Ultimately, entry to the home hemodialysis market is high risk, and, as the Baxter situation demonstrates, an uncertain proposition. And from a timing perspective, 2019 appears to be the most likely timeframe for new entry—well after the instant transaction is expected to close, and potentially insufficiently timely to counteract any increase in post-merger market power.

**Given Fresenius' dominant share, potential NxStage growth, deal may raise issues in an all dialysis machine market.** Home issues aside, the merger may also raise issues in a more broadly-defined, all-dialysis machine market.

Fresenius is dominant in the U.S. market, manufacturing more than 84% of dialysis machines **sold** in 2016—a slight downtick from reported 93% **shares** in 2015 and 2014. The company's 2008 series is currently the leading U.S. dialysis system, with more than 129,000 units in use in 2016.

Hemodialysis machines for chronic ESRD patients, including in-center and home, may also constitute a valid product market. The machines lack any real substitute (including peritoneal dialysis machines), and a hypothetical monopolist of such machines could very likely raise prices profitably.

To be clear, the NxStage System One, primarily used in-home, and the Fresenius 2008T and 2008K², used mainly in-center, may not compete closely head-to-head. However, as NxStage works towards shifting 10 to 15% of U.S. dialysis patients to home hemodialysis, almost all that growth would come at in-center's expense. And because Fresenius is dominant in-center, almost all of NxStage's expansion would come at Fresenius machines' expense. Furthermore, even if the machines are not close substitutes, the Fresenius 2008 series—the clear market leader in-center—and the NxStage System One—the clear market leader in-home—may compete on quality and innovation dimensions, geared at convincing doctors and patients to choose the modality, and clinics to ultimately purchase the machines.

In an all-hemodialysis machine market, Fresenius reports an 84% 2016 U.S. share. Assuming NxStage's share of all machines is 1.6% (80% of the 2% home hemodialysis market), combining the

two firms will increase HHI  roughly 270 points—a substantial concentration increase in an already highly concentrated market. However, because Fresenius benefits from a captive market for its machines at its centers, the relevant market may involve sales only to non-Fresenius providers, in which case the deal may increase an all-dialysis machine market HHI by between 100 and 200 points.

Importantly, to the extent the company's projections of a 10 to 15% home hemodialysis adoption rate prove accurate, NxStage's current share will understate the company's future competitive significance, and interaction with Fresenius. Despite a relatively small increase in current market concentration, a dominant player in machines and services acquiring a disruptive, potentially maverick competitor is a scenario that may raise FTC concerns.

**Fix would face certain logistical, commercial, competitive roadblocks.** If the FTC concludes that the transaction would lessen competition in an all-hemodialysis machine market, the problem is not amenable to a structural fix. The System One generated about 74% of NxStage's revenue in 2015, and the unit's sale would almost certainly eliminate Fresenius' rationale for pursuing the deal.

Fresenius' North American dialysis products segment generated $904 million in 2016 revenue. Although this segment includes non-machine products such as dialyzers, solutions, and drugs, divesting a significant portion of a $904 million business in order to acquire a company with $366 million in revenue is, from Fresenius' perspective, almost certainly a poor trade.

Even in the event that only the home hemodialysis machine market is an issue, a divestiture solution may prove complicated. To be clear, the 2008K@Home is in limited usage, faces limited growth prospects, and is, in and of itself, a sufficiently small percentage of Fresenius' products segment that divesting the machine would have little to no impact on the deal rationale.

Logistically, however, it is not clear that Fresenius could easily divest the Baby K. Fresenius' 2008 series includes three models: the 2008T, the 2008K$^2$, and the 2008K@Home. The Baby K, however, is effectively the exact same machine as its larger counterparts. "It's an identical version, only thing that's different is it's literally shorter—that's it," says Tagliagambe, adding "literally piece for piece each component is identical." "The platform for the Fresenius Baby K is really a 2008K machine—it's dressed up, but it's the same machine," adds Lockridge.

Put differently, not only is the 2008K@Home not a demonstrably autonomous, easily segregable business unit, but from manufacturing, marketing, and maintenance perspectives, it is not clear that Fresenius could actually divest the model, while leaving the rest of its 2008 series line untouched. Attracting a buyer that would restore price, quality, and innovation competition in the home market, while, by virtue of acquiring the platform, manufacturing, and technology related to the 2008K@Home, not enter into very direct competition with Fresenius in the in-clinic market, could prove difficult. This is especially the case given that Fresenius may argue during the review's early stages that the 2008K@Home is competitively insignificant, raising questions around whether and how a divestiture buyer could realistically present a viable business plan to acquire and compete effectively with the product post-acquisition.

To be clear, the 2008K@Home business is relatively marginal, and its divestiture could, in theory, both restore competition and maintain deal rationale. In practice, however, logistical, commercial, and competitive obstacles may complicate any fix—especially with an FTC that has grown increasingly skeptical of creative, high-risk settlement proposals and that views competitive issues in health care markets as warranting the strictest possible scrutiny.

**Merger agreement's litigation carve-out places reliance on substantial break fee.** At the end of the day, market structure and concentration issues, coupled with barriers to a structural fix, mean that the Fresenius/NxStage deal faces at least moderate antitrust risk. And the merger agreement's terms may exacerbate this risk even further.

The **agreement**, although obligating both parties to use reasonable best efforts to obtain antitrust clearance, provides an explicit litigation carve-out, stating that: "In no event shall the Parent [Fresenius] be obligated to (i) litigate against a Governmental Entity." Given structural and remedy

issues around the deal, this language may signal that in the event of an FTC full-stop challenge, the parties are unlikely to put the agency to its proof in court.

That said, the agreement does provide for a $100 million reverse termination fee, payable in the event the parties are unable to obtain antitrust clearance by the August 7, 2018 end date. This above-market reverse break fee, although indicating that the seller views the transaction as high-risk, does provide Fresenius an additional incentive to win clearance.

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

© 2017 by The Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum. Recipients shall not directly or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum. Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

Edit your subscription | Unsubscribe

1233 20th St. NW
Washington, DC, 20036
202.601.2300

# Exhibit D

Aug 22, 2017 11:36:26

## NxStage Drops After Capitol Forum Discusses Antitrust Risks

By Joshua Fineman

(Bloomberg) -- NxStage Medical/Fresenius faces at least "moderate" antitrust risk due to lack of "clear fix," structural issues in multiple relevant product markets, negative customer reaction, Capitol Forum said.

- NXTM, Fresenius market the only two hemodialysis machines FDA-approved for home use
    - Interviewed dialysis provider customer told Capitol Forum about concerns they had about the deal's impact on competition
- Transaction may also be problematic in the broader market for hemodialysis machines, where Fresenius has a "dominant in-clinic" position
- Fresenius told Capitol Forum deal would be pro-competitive for consumers, patients; NXTM didn't respond to request for comment
- NXTM/Fresenius spread $1.25 vs 89c Aug. 21
  NXTM falls 1.9% intraday after dropping 0.5% Aug. 21
- NOTE: Earlier, NxStage Medical Cut at Leerink as Chances of Another Bidder Fade

Related ticker:
FRE GR (Fresenius SE & Co KGaA)

To contact the reporter on this story:
Joshua Fineman in New York at jfineman@bloomberg.net

To contact the editors responsible for this story:
Arie Shapira at ashapira3@bloomberg.net
Scott Schnipper

© 2019 Bloomberg L.P. All rights reserved.

# Exhibit E



**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, December 19, 2017 4:59 PM
**To:** Teddy Downey
**Subject:** RE: hey

Teddy,

I'm sorry – yes, I have shared some articles with him. He had done me favors by getting me access to stuff I didn't have, but I should not have sent him anything of yours without your permission.

I really am sorry about this – it will not happen again.

▮▮▮▮▮

**From:** Teddy Downey [mailto:tdowney@thecapitolforum.com]
**Sent:** Tuesday, December 19, 2017 9:09 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** hey

hey ▮▮▮▮, it has come to my attention that you've sent my friend josh fineman some of our articles?  Is that correct?

Teddy Downey
CEO, Executive Editor
The Capitol Forum
202-601-2302

# Exhibit F



**From:** ████████████████████████

**Sent:** Thursday, January 3, 2019 2:17 PM

**To:** Teddy Downey

**Subject:** Fineman chat transcript

Teddy,

Josh would typically reach out to me over the course of 2017 via Bloomberg chat to see if I had a story. If I did, and again, I feel TERRIBLE about this, I would *sometimes* (not always) forward it him – although all of this stopped when you contacted me in December 2017.

The problem is, I can only pull up Bloomberg chats going back 365 days. So the only chat I have with Fineman in the last 365 days regarded some other publication named IPD, and what IPD said about the Akorn-Fresenius deal. You can see he initiated the chat, "hey", and asked "Do u ever see IPD stuff" and I replied that I didn't have it.

This chat was from August 24th, 2018.

| | |
|---|---|
| 11:23:43 | hey |
| 11:23:48 | Good aft |
| 11:23:58 | Do u ever see IPD stuff |

1

| | |
|---|---|
| 11:24:10 | Was tryign to get their take on AKRX |
| 11:24:18 | Who is IPD? |
| 11:24:41 | The patent/legal folks |
| 11:24:56 | Don't have it, sorry |
| 11:24:58 | I heard they said they think Fresenius will win the case |
| 11:25:17 | Tks anyway |
| 11:25:28 | sure |



# Exhibit G



From: **Joshua Fineman (BLOOMBERG/ NEWSROOM:)** <jfineman@bloomberg.net>
Date: Wed, Nov 8, 2017 at 1:14 PM
Subject: Re:Fwd: AT&T/Time Warner: DOJ Demands CNN Sell-Off, Potentially Forcing AT&T Decision in Next Several
Weeks
To: <██████@gmail.com>

tks

---

To contact me please call 212-617-8953 work 917-402-6904 cell

From: ████████@gmail.com At: 11/08/17 16:11:05
To: JOSHUA FINEMAN (BLOOMBERG/ NEWSROOM: )
Subject: Fwd: AT&T/Time Warner: DOJ Demands CNN Sell-Off, Potentially
Forcing AT&T Decision in Next Several Weeks

---------- Forwarded message ----------
From: **The Capitol Forum** <editorial@thecapitolforum.com>
Date: Wed, Nov 8, 2017 at 12:40 PM
Subject: AT&T/Time Warner: DOJ Demands CNN Sell-Off, Potentially Forcing AT&T
Decision in Next Several Weeks
To: "████████cap.com" <████████cap.com>

Web Version | Update preferences | Unsubscribe



## AT&T/Time Warner: DOJ Demands CNN Sell-Off, Potentially Forcing AT&T Decision in Next Several Weeks

*Vol. 5 No. 373 - November 8, 2017 - **Click here** to access our library.*

<u>DOJ Update</u>

The DOJ is demanding AT&T sell off CNN before clearing the Time Warner purchase, which could force AT&T to decide as soon the next several weeks whether to agree to the divestiture or prepare to defend itself against a government lawsuit to block the deal, a source familiar with the matter said.

Negotiations between the DOJ and AT&T are fluid, and new developments could change the trajectory of the discussions and timing, the source said.

The DOJ's demand could raise concerns about the department's motivations in light of President Trump's threats to clamp down on media criticism of his administration, and his singling out of CNN's coverage as particularly unfair.

But in making the divestiture demand, new antitrust chief Makan Delrahim could be considering well-established antitrust theories of harm, such as input and customer foreclosure.

The political argument also could be more difficult to make if the DOJ, as CNBC originally reported, more broadly is demanding AT&T sell off Turner Broadcasting, which, in addition to CNN, includes TNT, TBS, Adult Swim and Turner Classic Movies. Turner contributed about $11.3 billion to Time Warner's total 2016 revenue of $29.3 billion.

Until recently, the DOJ in its discussions with AT&T had demanded primarily behavioral conditions to ensure AT&T's MVPD and wireless competitors could buy Time Warner programming on fair and **reasonable terms**.

But Delrahim said in a recent speech that he generally did not favor behavioral remedies because they required too much oversight from the DOJ.

The change in DOJ's demands has thrown off AT&T's schedule for consummating the transaction. AT&T CFO John Stephens reportedly told participants in a New York City financial conference Wednesday that the timing of the deal's closing, which the company had said would be done by year's end, is now "uncertain."

Although the DOJ usually addresses the antitrust harms of vertical mergers such as AT&T/Time Warner with conditions, DOJ negotiators and deal critics have criticized conditions imposed on Comcast/NBCUniversal in 2011 as ineffective, sources said.

Spokespeople for AT&T and the DOJ didn't immediately return requests for comment.

### In-depth: Input, Customer Foreclosure Theories of Harm Could Drive DOJ Divestiture Ask

**Input foreclosure as key theory of harm.** Although the AT&T/Time Warner deal raises a host of vertical issues, perhaps the most straightforward theory of harm arising from the transaction involves input foreclosure, or the prospect that AT&T would withhold Turner content—including TNT, TBS, and CNN—from rival pay-TV distributors, or raise its MVPD rivals' costs for the content **post-merger.**

Although the Time Warner acquisition will clearly give AT&T the ability to withhold Time Warner content, the company's incentive to actually do so is a more complicated question. AT&T has agreed to pay roughly $85.4 billion for a Time Warner business that generates revenue primarily through MVPD distribution agreements and advertising sales, and withholding Turner content from willing buyers would substantially reduce the segment's revenue.

DOJ's ultimate consideration in assessing an input foreclosure strategy's likelihood, then, is whether AT&T would actually gain the incentive to withhold the Turner content from MVPD competitors—a function of AT&T's ability to recoup upstream losses through enhanced downstream, MVPD profits. Given the reported Turner ask, DOJ appears to have concluded that the acquisition would drive such incentives, which the Division may view as not amenable to a behavioral fix.

**Customer foreclosure as a second key theory of harm.** Although less likely to impact consumer prices in the near-term, customer foreclosure, through which AT&T could discriminate against Time Warner's upstream programming rivals in distribution post-merger, also represents a potential **competitive issue.**

In practice, customer foreclosure is input foreclosure's mirror image—rather than AT&T withholding from rival distributors a crucial input such as TNT, TBS, or HBO, a customer foreclosure strategy would involve AT&T excluding Time Warner's upstream (Fox, Viacom, etc.) competitors' access to AT&T's broadband, wireless, or MVPD customers in order to benefit its newly-acquired Time Warner content segment.

Customer foreclosure concerns would appear to explain DOJ's CNN ask. Unlike general entertainment programming, the cable news market is arguably highly concentrated, including just three important competitors—CNN, Fox News Channel, and MSNBC. The cable news networks offer a unique product—full-day programming sourced from the same material. And notably, unlike general entertainment programming, cable news faces no real threat from OVD competitors Netflix,

Hulu, or Amazon.

As a result, the cable news networks may be relatively close substitutes from both viewer and advertiser perspectives. This conclusion is to some extent borne out by demographics, where the cable news viewers (CNN (median age 61), MSNBC (63), Fox News (67)) skew substantially older than broadcast network (median age of 54), or broadcast/cable viewers (44.4). And from an advertisers' perspectives, the cable news networks may represent a unique platform for targeting an older audience, or, given viewership, certain issue or political advertisements.

Given these issues, AT&T's post-merger incentives to discriminate against unaffiliated programming may be most pronounced in cable news. This is especially the case given that MSNBC, a second cable news competitor, is owned by Comcast. In fact, well before Delrahim entered the division, DOJ staff was investigating whether AT&T's proposed Time Warner acquisition would heighten the potential for the merged company and Comcast to coordinate to harm content and video distribution rivals.

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

© 2017 by The Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum. Recipients shall not directly or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum. Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

Edit your subscription | Unsubscribe

1250 23rd St. NW
Washington, DC 20037
202-601-2300

# Exhibit H



From: ▮▮▮▮▮▮▮ <▮▮▮▮▮▮▮@gmail.com>
Date: Mon, Nov 13, 2017 at 1:13 PM
Subject: Fwd: AT&T/Time Warner: DOJ Criticized Comcast/NBCU Consent Decree as Ineffective Before Rejecting Parties' Behavioral Remedy Proposals
To: Joshua Fineman <jfineman@bloomberg.net>

---------- Forwarded message ----------
From: **The Capitol Forum** <editorial@thecapitolforum.com>
Date: Mon, Nov 13, 2017 at 12:55 PM
Subject: AT&T/Time Warner: DOJ Criticized Comcast/NBCU Consent Decree as Ineffective Before Rejecting Parties' Behavioral Remedy Proposals
To: "▮▮▮▮▮▮▮cap.com" <▮▮▮▮▮▮▮cap.com>

Web Version  |  Update preferences  |  Unsubscribe



### AT&T/Time Warner: DOJ Criticized Comcast/NBCU Consent Decree as Ineffective Before Rejecting Parties' Behavioral Remedy Proposals

*Vol. 5 No. 383 - November 13, 2017 - __Click here__ to access our library.*

**DOJ Update**

DOJ leadership, in meetings with AT&T and Time Warner representatives, slammed the department's Comcast/NBCUniversal consent decree as ineffective and easily undercut, rejecting AT&T and Time Warner's call for a similar agreement to fix the government's problems with their deal, sources familiar with the matter said.

In the recent meetings, the DOJ said it is concerned Comcast could have violated the NBCU consent decree requirement that it not involve itself in video streaming service Hulu's operations, the sources said. The department's critical view of the 2011 settlement in part led new DOJ antitrust chief Makan Delrahim last week to demand divestitures instead of behavioral remedies from AT&T CEO Randall Stephenson, the sources said.

Deal supporters have pointed to Comcast/NBCU as the deal most analogous to AT&T/Time Warner and the transaction's consent decree as a proven check on Comcast's ability to harm rival MVPDs and content companies, urging a similar agreement for AT&T/Time Warner. But the DOJ's dismissal of the decree, and behavioral remedies generally, signals the difficulty AT&T faces in convincing the government to accept a settlement involving anything less than divestitures of Time Warner-owned Turner Broadcasting's cable networks.

The government has until around Thanksgiving, sources said, to decide whether to sue or accept a remedy addressing its concerns. Those include AT&T through the acquisition gaining the power to raise MVPD rivals' costs for Time Warner content, or coordinate with Comcast to obtain the best contract terms from competitors.

If the DOJ sues, the Comcast/NBCU consent decree could become the focus of a courtroom fight over the effectiveness of behavioral remedies, until recently the government's preferred method for fixing harms in vertical mergers. Delrahim in a speech last month said he favored divestitures over behavioral fixes and that the DOJ is reviewing 1,400 consent decrees the DOJ made with companies.

The DOJ has in the past accused AT&T of not hewing to merger-related consent decree conditions. In 2009, AT&T agreed to pay more than $2 million to settle department allegations that the company violated a consent decree and related court order regarding the purchase of Dobson Communications.

So far, the DOJ hasn't indicated an interest in moving against Comcast for any alleged violations, sources said, although President Trump as a candidate said he wanted to unravel the NBCU deal. The department could, if it chose, file a civil contempt action in federal court to stop any alleged violations. If the DOJ wanted to go further and demand harsher behavioral restrictions or even divestitures, it would likely have to file a separate case.

Through the years, Comcast has proclaimed the success of the NBCU decree, noting that industry players filed under arbitration only a handful of complaints against the company. Comcast's critics said so few complaints were filed because the arbitration system took too long to render a decision, prompting the DOJ to insist on a speedier arbitration system in an AT&T/Time Warner consent decree under discussion.

Spokespeople for the DOJ and AT&T declined to comment. Comcast did not immediately return requests for comment.

**Comcast violation alleged.** In 2013, executives from Comcast, 21st Century Fox, and Disney – Hulu's co-owners – allegedly discussed the video service's future, according to 2015 a Wall Street Journal article. At a Sun Valley, Idaho, meeting, Comcast allegedly said it would help make Hulu a service nationally competitive with Netflix, potentially violating Comcast's promise to the DOJ to become a silent Hulu co-owner after the NBCU purchase.

Comcast's proposal persuaded the co-owners to call off the sale, according to the paper. A Comcast spokesperson at the time denied that the company violated the consent decree.

<u>Distaste for Behavioral Fixes</u>

In his first speech as the DOJ antitrust head, Delrahim made known his distaste for behavioral fixes, telling an audience last month that he was a law enforcer, not a regulator who would monitor companies' adherence to consent decree conditions.

While for decades the DOJ most often has imposed behavioral conditions on problematic vertical mergers, Delrahim's insistence that AT&T sell off Time Warner-owned Turner Broadcasting networks is part of a larger movement on the left and right toward structural relief in such deals.

The new antitrust chief reached his decision after reviewing the Obama administration's conclusion last year that it would sue to block Lam Research's bid for KLA-Tencor, a separate source said. The department generally considered the deal a vertical transaction, combining the No. 1 supplier of semiconductor fabrication equipment with a major provider of measuring and inspection equipment. In successfully pressuring the parties to walk away from the deal, the DOJ said Lam Research would have had the ability to foreclose its competitors by delaying their access to important KLA-Tencor equipment and services.

In any potential courtroom battle, the government and AT&T will focus their legal arguments on Time Warner acquisition's alleged harms and benefits. AT&T CEO has argued publicly and in meetings with the DOJ, the deal would allow his company to offer new video content designed for its wireless customers and utilize customer data to let advertisers tailor their messages to specific audiences. Vertical mergers can result in significant cost efficiencies, which is the major reason U.S. antitrust enforcers have been more reluctant to block the deals compared with transactions between direct competitors.

Delrahim, though, challenged Stephenson's efficiencies claims and told the executive that they could be realized through contractual agreements with Time Warner and didn't require the company's acquisition, a source familiar with the matter said.

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

1200 20th St. NW
Washington, DC 20036
202-601-2300

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

© 2017 by The Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum. Recipients shall not directly or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum. Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

Edit your subscription | Unsubscribe

# Exhibit I



From: **Joshua Fineman (BLOOMBERG/ NEWSROOM:)** <jfineman@bloomberg.net>
Date: Tue, Nov 14, 2017 at 12:14 PM
Subject: Re:Fwd: Discovery/Scripps: Given AT&T/Time Warner Developments, Malone Common Ownership Issues May Raise Vertical Concerns
To: <████████@gmail.com>

tks

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

To contact me please call 212-617-8953 work 917-402-6904 cell

From: ████████@gmail.com At: 11/14/17 15:12:16
To: JOSHUA FINEMAN (BLOOMBERG/ NEWSROOM: )
Subject: Fwd: Discovery/Scripps: Given AT&T/Time Warner Developments,
Malone Common Ownership Issues May Raise Vertical Concerns

---------- Forwarded message ----------
From: **The Capitol Forum** <editorial@thecapitolforum.com>
Date: Tue, Nov 14, 2017 at 10:00 AM
Subject: Discovery/Scripps: Given AT&T/Time Warner Developments, Malone Common Ownership Issues May Raise Vertical Concerns
To: "████████cap.com" <████████cap.com>

Web Version  |  Update preferences  |  Unsubscribe



## Discovery/Scripps: Given AT&T/Time Warner Developments, Malone Common Ownership Issues May Raise Vertical Concerns

*Vol. 5 No. 384 - November 14, 2017 - **[Click here](#)** to access our library.*

**Deal Update**

Liberty Media Chairman John Malone's cross-ownership interests in Charter Communications and Discovery may raise DOJ concerns around whether Malone would be positioned to influence Discovery to foreclose programming from Charter's rivals post-merger.

Although the FCC in 2016 concluded that it would be unprofitable for Malone to foreclose Charter's rivals from Discovery programming, the analysis also identified certain Scripps programming as a substitute for certain Discovery content. However, because the instant transaction would unite Discovery and Scripps programming under common control, interviewed economists indicate that analyzing the deal would almost certainly require modifications to the FCC's previous diversion analysis.

The potential vertical issue arising from Malone's cross-ownership takes on increased importance given DOJ's aggressive position in an AT&T/Time Warner transaction which combines distribution and programming assets.

However, a number of factors ultimately distinguish the two deals, including Malone's lack of outright ownership of both content and distribution assets, Discovery/Scripps' lack of clear "must have" content, and the emergence of over the top content delivery options. Ultimately, then, although the Malone cross-ownership issue might require the parties additional time to resolve, it does not appear to be an issue likely to delay closing, or otherwise result in remedial action.

**The financial entanglements of John Malone and Advance Newhouse in Charter and Discovery.** The FCC examined potential foreclosure issues raised by Malone's ownership interests in both Charter and Discovery in connection with its review of the Charter/TWC transaction, which closed in 2016. The Charter/TWC transaction also involved the simultaneous acquisition of Bright House, a small cable company controlled by Advance Newhouse (AN), which also had an ownership interest in both Discovery and Charter.

Malone had an ownership interest in Discovery and sat on its Board of Directors.  Malone's holdings also included various stakes in Liberty Broadband and Liberty Interactive, which in turn held various stakes in Charter.  As part of its analysis, the FCC assumed that the Malone and AN ownership interests in both Charter and Discovery would align their incentives, increasing the likelihood that they would wield their joint influence to withhold Discovery programming from MVPDs that compete with Charter.

Although combining Malone's and AN's ownership interests overstates Malone's independent influence over Charter and Discovery, it accounts for the scenario that Malone and AN might act in concert to influence Charter or Discovery if each would benefit from the coordination.

In response to a request for comment, Discovery provided the following statement: "We are working with the Department of Justice to review the proposed transaction and continue to provide information in support of that review. We continue to anticipate closing the transaction by early 2018, bringing together a suite of world-class linear, digital and short-form entertainment brands to the benefit of consumers and business partners, and creating a more durable independent media company."

Scripps did not respond to a request for comment.

<u>**In Depth: Input Foreclosure the Most Significant Concern Raised by Cross Ownership**</u>

**Analytical approach to consider equity and diversion ratios.** The general input foreclosure concern in both Charter/TWC and Discovery/Scripps is that Malone and AN would jointly exert their influence over Charter and Discovery to increase the cost or completely withhold Discovery programming from Charter's rivals.

A profit maximizing firm would only engage in foreclosure if they expect their foreclosure revenue (generated from new Charter subscribers seeking withheld Discovery content) will exceed lost licensing revenue (affiliate fees and advertising revenues that would have been earned from licensing foreclosed MVPD rivals).  As the FCC is not reviewing the Discovery/Scripps transaction, DOJ will undertake an independent analysis of equity and diversion ratios to predict whether a foreclosure strategy would be profitable. It is likely that DOJ's findings will be similar to the FCC's findings in the Charter/TWC transaction as Malone's and AN's respective holdings in Charter and Discovery are largely unchanged.

Generally, the equity ratio represents the effective ownership that Malone and AN would have in both Charter and Discovery based on the ownership interests each has in various entities that hold Charter and Discovery equity. In Charter/TWC, the FCC found that Malone and AN would have a combined 35.8 percent equity share of Discovery and a combined 14.7 percent ownership interest in the new Charter entity.

The diversion ratio, generally, considers both the expected departure rate (the number of subscribers estimated to switch to Charter should they be foreclosed from Discovery programming) and the critical departure rate (the number of subscribers that would have to switch to Charter to make the foreclosure profitable).

Based in part on the equity ratio and diversion rates considered on a nationwide and DMA level basis, the FCC concluded that the relatively limited equity interests that Malone and AN would have in Charter (14.7 percent), relative to their equity interests in Discovery (35.8 percent) would make foreclosure unlikely.  Any additional revenue gained from subscribers switching to Charter to obtain otherwise foreclosed Discovery programming would be far outweighed by Discovery's potential loss of licensing and advertising revenues.  In other words, given the equity ratios, the level of diversion to Charter was determined to be insufficient to make a foreclosure strategy profitable.

**Scripps addition could potentially impact foreclosure analysis outcome.** An important component of the diversion analysis is the availability of programming substitutes. That is, subscribers of rival MVPDs might turn to these programming alternatives instead of switching to Charter should they be denied Discovery programming post-merger.

When identifying substitutes for Discovery in connection with the Charter/TWC transaction, the parties identified the History, National Geographic, Smithsonian, and Travel channels, PBS stations, and HGTV as substitutes for Discovery's general programming. Two of the identified Discovery programming substitutes, however, are Scripps networks - the Travel Channel and HGTV. These putative substitutes, would of course, be controlled by Discovery should it acquire the Scripps networks.  It follows that if subscribers foreclosed from Discovery programming have fewer programming substitutes, there is a greater likelihood that they will switch to Charter.

A subscriber of a foreclosed MVPD may be further encouraged to switch to Charter if additional popular content becomes part of the Discovery programming bundle that is foreclosed.  That is, if the Scripps programming is also denied to rival MVPDs once it becomes part of Discovery, it may incrementally increase the likelihood that subscribers would defect if they do not believe there are adequate substitutes to the foreclosed Scripps programming.

An economist not affiliated with the transaction stated, "from an economic perspective, it is possible that if formerly independent Scripps programming was considered as a substitute for general Discovery programming in the FCC's previous analysis, the diversion ratio could be different if Scripps and Discovery programming now became affiliated."

<u>In Depth: Numerous Factors Indicate that Foreclosure Will Not Require Remedial Action</u>

**Discovery/Scripps' lack of "must have" programming makes substitution less critical.**
Although Discovery's acquisition of Scripps may, on the margins, increase the risk of post-merger foreclosure, there are a number of factors that suggest that DOJ concludes—as the FCC did in 2016—that a Charter-focused foreclosure strategy would not be profitable in the Discovery/Scripps transaction.

The degree to which Discovery programming and Scripps programming are considered substitutes will certainly affect the level of diversion if both are withheld from subscribers.  But an important related inquiry goes to how critical subscribers consider the foreclosed programming itself. That is, if subscribers do not view programming as "must-have," they will be less inclined to switch to another MVPD provider if that programming is withheld.

Certain types of programming such as sports, broadcast network programming, and certain news channels may be considered "must have" or marquee programming by subscribers – a point at the heart of the DOJ's foreclosure concerns in the AT&T/Time Warner transaction. While popular, it is unlikely that either Discovery or Scripps programming is considered to be "must have" by subscribers.

In the Charter/TWC review, Discovery itself asserted that it "does not offer the type of broadcast network or regional sports programming that would cause subscribers to switch MVPDs." And, according Discovery, it would not be profitable for it to foreclose Charter's competitors because, "not only would it lose licensing fees and advertising revenues, viewers would find substitutes and stop watching its programming."

A number of metrics—most notably, the companies' declining subscriber bases—support this view of

the Discovery and Scripps programming. Moreover, according to an RBC Capital Market Report, Scripps has a 5 percent ratings share but represents only 1.7 percent of affiliate fees. Discovery has an 8.1 percent rating share but receives only 5.3 percent of affiliate fees. This indicates that at the bargaining table, Discovery and Scripps are not considered to be "must have" programming by MVPDs as much as other networks such as Disney, which has an 8.5 percent rating share but accounts for 34.4 percent of affiliate fees.

The lack of marquee programming offered by both Discovery and Scripps likely dampens the level of diversion of foreclosed subscribers to Charter as well as the impact of any putative substitution between the programming of the two networks.

**OTT, broadband issues.** The emergence of "over the top" (OTT) could also mitigate the effectiveness of a foreclosure strategy. OTT refers to the delivery of content via the internet without requiring users to subscribe to cable or satellite pay-tv service like Charter or DIRECTV. If foreclosed subscribers can obtain Discovery or Scripps programming without the need to switch to Charter, a foreclosure strategy would be less successful.

There is a growing list of OTT service providers such as DirecTV NOW, Sling, Hulu, PlayStation Vue, and YouTube TV offering customers the opportunity for highly personalized content delivery, including access to Discovery and Scripps programming.  And while Discovery and Scripps do not currently offer a separate OTT option, the companies are expected to offer such service in the near term. Indeed, one of the purported benefits of the merger is the ability to provide a more compelling OTT option by combining popular Discovery and Scripps programming.

But OTT usually requires a broadband connection, which is generally provided by the customer's local cable company.  Eric Schumacher-Rasmussen, editor at StreamingMedia.com explains, "customers seeking to cut the cable cord cannot completely free themselves from the cable company, at least today.  And while there are nascent services such as Verizon go90 and Vivendi Studio+ that are pure wireless plays, customers choosing an OTT option will more likely than not have to rely on their broadband cable provider to enjoy OTT service."

The question then becomes whether OTT is a viable mitigating factor if Charter stands to gain even if subscribers of its MVPD rivals depart to an OTT option, rather than switching directly to Charter's pay TV service.  In theory, Charter could realize increased revenues from new broadband customers or if existing broadband customers upgrade their data package to accommodate for increased data usage for OTT services.

Broadband data and pay TV, however, are currently available as separate services and a proliferation of OTT services would not necessarily mean increased revenues for cable broadband services. It is common that pay TV subscribers to Charter's rivals such as DISH and DirecTV are already Charter broadband customers as satellite data transmission is less than ideal.  And, at least today, broadband service pricing is not tiered in terms of the amount of data consumed, but rather by upload and download speeds.

Schumacher-Rasmussen believes that while there could be opportunities for mischief—for example Comcast has been accused of throttling transmission speed of Netflix once a certain amount of data has been consumed—that is not yet a documented widespread concern.

**Other factors counseling against the likelihood of foreclosure.** For Discovery to employ a foreclosure strategy that would benefit Malone and AN by virtue of their interest in Charter, such strategy could also involve the company potentially violating its fiduciary duty to company shareholders. This is especially the case given that, Discovery directors, such as Malone, must recuse themselves from any decision that involves or affects their personal, business, or professional interests.

Likewise, assuming there have not been any corporate governance changes since the closing of the Charter/TWC transaction in 2016, there are numerous controls in place that would prevent Malone and AN from improperly influencing Charter. These include, among other things, that programming-related transactions require approval by a majority of unaffiliated directors. The Charter Board of

Directors' 13-member composition ensures that the five directors that Malone and AN can nominate would not be able to cause Charter to undertake conflicted transactions that do not benefit Charter as a whole.

Finally, since the closing of the Charter/TWC transaction, there do not appear to have been reported incidents where Malone or AN have attempted to use their influence to cause Charter or Discovery to seek supra-competitive affiliate fees or to foreclose competing MVPDs altogether from Discovery programming.

**Differences between AT&T/Time Warner and Discovery/Scripps reviews.** The DOJ's aggressive position in the AT&T/Time Warner review raises the possibility of increased scrutiny on the Discovery/Scripps transaction. However, although the DOJ's aggressive position certainly demonstrates an increased interest in vertical foreclosure issues in the MVVPD space, there are significant difference between the two transactions.

The primary difference is that AT&T/Time Warner is a vertical transaction through which a significant MVPD is purchasing a significant content provider. The Discovery/Scripps transaction, by contrast, does not involve distribution assets that would make foreclosure more probable. Although Malone's cross ownership interest in both Discovery and Charter introduces a vertical relationship between distribution and content that creates some similarities with the AT&T/Time Warner transaction, there are several additional factors that distinguish the two transactions.

One significant differentiator is that AT&T is directly acquiring a 100 percent interest in Time Warner's programming.  Thus, there are no equity ratios, speculation regarding aligned incentives due to partial ownership interests, assumptions that fiduciary duties would be ignored, or corporate governance safeguards against interested transactions. These factors reducing the likelihood of foreclosure are not present in the AT&T/Time Warner transaction.

The quality of the content at play is also a significant differentiator. In the AT&T transaction, the foreclosure concerns are driven in large part by the fact that many of Time Warner's cable networks transmit content that is perceived to be vital to subscribers of rival MVPDs, such as exclusive NBA, MLB, and NCAA Men's Basketball tournament programming. This programming is considered "must have" insofar as subscribers would not view other programming, even alternative sports programming, as adequate substitutes, and may therefore switch MVPDs to regain access to the content, if withheld.

While Discovery and Scripps both have popular programming, neither appear to have content that subscribers would consider to be "must have" in nature.  This is evidenced by the lower affiliate fees that both Discovery and Scripps receive in proportion to their rating share as well as Discovery's own acknowledgement that it, "does not offer the type of broadcast network or regional sports programming that would cause subscribers to switch MCPDs."

Accordingly, although the cross-ownership issue might require the parties to spend additional time to resolve, particularly in light of the recent AT&T/Time Warner developments, it does not appear to be an issue that would delay closing or result in remedial action.

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

1239 20th St. NW
Washington DC 20036
202-601-2300

© 2017 by The Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum. Recipients shall not directly or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum. Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

**Edit your subscription** | **Unsubscribe**

# Exhibit J



From: ██████████ <██████████@gmail.com>
Date: Thu, Nov 16, 2017 at 2:27 PM
Subject: Fwd: AT&T/Time Warner: As Sides Show No Signs of Nearing Settlement, Delrahim Issues Biting Critique of Behavioral Remedies
To: Joshua Fineman <jfineman@bloomberg.net>


---------- Forwarded message ----------
From: **The Capitol Forum** <editorial@thecapitolforum.com>
Date: Thu, Nov 16, 2017 at 12:40 PM
Subject: AT&T/Time Warner: As Sides Show No Signs of Nearing Settlement, Delrahim Issues Biting Critique of Behavioral Remedies
To: ██████████cap.com" <██████████cap.com>


Web Version  |  Update preferences  |  Unsubscribe



## AT&T/Time Warner: As Sides Show No Signs of Nearing Settlement, Delrahim Issues Biting Critique of Behavioral Remedies

*Vol. 5 No. 386 - November 16, 2017 - **Click here** to access our library.*

**DOJ Update**

As AT&T and DOJ show no signs of nearing a settlement, DOJ antitrust chief Makan Delrahim on Thursday issued a withering critique of behavioral remedies, the foundation of the two sides' earlier consent decree talks.

If Delrahim's speech hardened the DOJ's position on the deal, AT&T itself has shown no signs of acceding to DOJ's demands, and has offered no significant structural proposal to address Delrahim's request that the company sell off Turner Broadcasting networks, a source familiar with the matter said. The DOJ has until the end of the month to decide whether to sue or accept a settlement, sources said.

In a Tuesday meeting, Delrahim told leaders of the American Bar Association's antitrust section that he could file suit at any time or, with the permission of the parties, extend the department's review, a

source familiar with the meeting said.

A suit based on Delrahim's criticisms could clarify a long-running debate over whether antitrust enforcers should handle anticompetitive harms in verticals deals such as AT&T/Time Warner through behavioral remedies. Dealmakers have expressed alarm that a DOJ court victory could chill the environment for mergers and acquisitions. An adverse court ruling, however, could make it more difficult for US antitrust enforcers to address competition concerns arising from vertical transactions.

An AT&T spokesman confirmed Wednesday that the company and Time Warner had hired Daniel Petrocelli of O'Melveny & Meyers as lead trial counsel in the event DOJ sues.

**Delrahim speech.** In his Thursday speech at the ABA Fall Forum, Delrahim sharply criticized behavioral remedies as ineffective and overly regulatory.

"At times antitrust enforcers have experimented with allowing illegal mergers to proceed subject to behavioral commitments. That approach is fundamentally regulatory, imposing ongoing government oversight on what should preferably be a free market," he said.

Cloaking his criticism of conduct remedies in a deregulatory, free-market conservative vocabulary— and citing antitrust scholars ranging from Robert Bork to John Kwoka—Delrahim argued that conduct remedies "require centralized decisions instead of a free market process. They also set static rules devoid of the dynamic realities of the market," he added.

Notably, Delrahim directly criticized arbitration remedies, which DOJ and the parties had discussed as a potential fix to foreclosure issues arising from the AT&T/Time Warner transaction. He said arbitration distorted the competitive process, and described an arbitrator as akin to a central planner.

Although Delrahim did not mention AT&T/Time Warner by name, he did cite a June 21 letter from 11 Senate Democrats calling for close scrutiny of the telecom tie-up. Delrahim mentioned the Democrats' contention that "after reviewing conditions placed on the Comcast-NBCUniversal deal, we believe that the demonstrated lack of enforceability and reliability of such conditions have rendered them insufficient as remedies for deals of this nature." The view is largely consistent with the DOJ front office's opinion of the NBCU conditions' effectiveness, a source familiar the matter said.

Delrahim also argued that such conditions have "proven challenging to enforce" and "demand ongoing monitoring and enforcement." Conditions also raise difficult questions about duration—an issue that was a key sticking point in AT&T/DOJ settlement talks.

"Behavioral remedies often require companies to make daily decisions contrary to their profit-maximizing incentives … It is the wolf of regulation dressed in the sheep's clothing of a behavioral decree," he said. "If a merger is illegal, we should only accept a clean and complete solution."

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

1300 20th St. NW
Washington, DC 20003
202-601-2300

© 2017 by The Capitol Forum. The contents of this email and any
proprietary content it enables you to access are copyrighted by The
Capitol Forum. Recipients shall not directly or indirectly reproduce,
download or otherwise distr bute (in print, electronic, or intranet
format) this content without prior written permission from The
Capitol Forum. Unauthorized reproduction or distr bution is a
violation of Federal Copyright Law.

**Edit your subscription | Unsubscribe**

# Exhibit K

# Tables of Infringed Capitol Forum Publications
# and Bloomberg's Infringing Works

Tables I and II set forth below include, to the extent currently known, instances in which Bloomberg illegally solicited and obtained Capitol Forum's copyrighted publications, and are the subject of Capitol Forum's contributory copyright claim. (Table I reflects contributory and direct infringement claims, as well as misappropriation claims.  Table II reflects only contributory infringement and misappropriation claims):

## **Table I**

|  | Date of Publication[1] | Title of Capitol Forum Report | Title of Infringing Bloomberg Work |
|---|---|---|---|
| 1 | June 6, 2016 | Walgreens/Rite Aid: Staffing Update; FTC Focus on Closeness of Competition; Price Discrimination Issues May Be Off Table | FTC Review of Rite Aid/Walgreens Focused on PBMs: Capitol Forum |
| 2 | June 9, 2016 | Globalstar TLPS: With 2-3 Vote a Possibility at FCC, Wheeler Most Likely to Pull Order, But May Not Reintroduce | Globalstar Order May Be Pulled by Wheeler: Capitol Forum (Yday) (June 10, 2016) |
| 3 | June 20, 2016 | Walgreens/Rite Aid: Sources Indicate FTC Investigation Progressing More Slowly Than Anticipated, Near-Term Staff Conclusion Unlikely; A Closer Look at the Role of Customer Complaints in Agency Enforcement Decisions | FTC RAD/WBA Probe Moving Slower Than Expected: Capitol Fourm |
| 4 | July 8, 2016 | Stamps.com: Reliance on Negotiated Service Agreements with USPS, Relationship with IntuiShip Leaves Stamps.com with Significant Regulatory Risk; USPS Can Terminate NSA with 30 Days' Notice if Agency Finds Abuse | Stamps.com Falls 12% After Cautious Mention by Capitol Forum (July 11, 2016) |
| 5 | July 20, 2016 | Walgreens/Rite Aid: Sources Indicate PBM Network Issues Main Focus of | RAD Down; FTC N-T Resolution on Walgreen Unlikely: Capitol Forum |

---

[1] Unless otherwise noted, the date of publication of the Capitol Forum article is the same as the Bloomberg First Word article.

| | | Staff's Ongoing Investigation, Near-Term Resolution Unlikely | |
|---|---|---|---|
| 6 | July 20, 2016 | Vista/Cvent: High Combined Market Share and Entry Barriers in Strategic Meeting Management Could Create Hurdle to Clearance; Increased DOJ Interest in Data Privacy May Drive Additional Scrutiny | Cvent Drops 4.2%; Capitol Forum Discussed Antitrust Risk Yday (July 21, 2016) |
| 7 | July 21, 2016 | Stamps.com: USPS Switch to Clearer Rate Table Will Eliminate Loophole Currently Benefiting Resellers; USPS Plans Aggressive Effort in 2017 to Bring Sales In-house and Rely Less on Resellers | Stamps.com Mentioned Cautiously Again by Capitol Forum (July 22, 2016) |
| 8 | August 5, 2016 | Verisign: Verisign Purchase of .web Domain, Attempt to Get Eight Year Extension of Profitable .com Contract Likely to Attract Attention from DOJ Antitrust Division's Net Tech Group | VeriSign's .web Buy May Attract Antitrust Review: Capitol Forum |
| 9 | September 2, 2016 | Verisign: Key Takeaways from DOJ Response Regarding Review of .Com Contract Extension | Verisign Holders 'Likely Misreading' DOJ Response: Capitol Forum |
| 10 | October 10, 2016 | ChemChina/Syngenta: Limited Political Opposition and Overlaps Likely to Drive Antitrust Clearance in Europe After Phase I Investigation | Syngenta/ChemChina Likely to Be Approved by EC: Capitol Forum |
| 11 | October 17, 2016 | Vista/Cvent: Issuance of Third-Party CIDs Suggests DOJ Considering SSM-only Market Definition; Timing of CIDs Indicates Near-Term Resolution Unlikely | Cvent/Vista Third Parties Getting CIDs From DOJ: Capitol Forum |
| 12 | October 19, 2016 | Walgreens/Rite Aid: Staff's Ongoing PBM-Focused Investigation Indicates Current Divestiture Package Insufficient to Address FTC Concerns; McSweeny Remarks Point to Commission-Level Headwinds | RAD/WBA Divestitures Likely Insufficient for FTC: Capitol Forum |

| 13 | November 11, 2016 | Vista/Cvent: Addition of Veteran Staff Attorney to DOJ Investigation Team, Vista Decision to Refuse Timing Agreement, Suggests Litigation Most Likely Outcome; Investigation Timing Drives Remaining Uncertainty | DOJ May Be Preparing to Block Cvent/Vista Deal: Capitol Forum |
|---|---|---|---|
| 14 | November 16, 2016 | Bass Pro Shops/Cabela's: Heightened Promotional Competition in Overlap Markets, Lack of Divestiture Obligation Drive FTC Clearance Risk | Cabela's Paring Gains; Capitol Forum Highlights FTC Deal Risk |
| 15 | December 2, 2016 | Walgreens/Rite Aid: As FTC Focus Turns to Buyer Approval, Sycamore Partners Emerges as Key Potential Acquirer—PE, Network, Operational Issues Drive FTC Evaluation | Sycamore Said to Be Potential Buyer of RAD/WBA Stores: Cap Forum |
| 16 | December 22, 2016 | Danone/WhiteWave: Transition May Drive Less Aggressive DOJ Front Office, Reduce State AG, Congressional Influence; a Closer Look at Organic Valley, Other Buyers' Potential Post-Merger Demand Responses | Republican Win a Positive for WhiteWave-Danone: Capitol Forum |
| 17 | February 10, 2017 | Boral/Headquarters: Fly Ash Overlap, Market Concentration Issues Lead to FTC Second Request; a Closer Look at Fly Ash Product Market, Price, and Output Considerations | HW/Boral Customers Said Not Concerned About Deal: Capitol Forum |
| 18 | March 1, 2017 | FleetCor: Sales and Billing Practices Raise Questions Regarding the Legitimacy of FleetCor's Fee-Based Income | FleetCor Down; Capitol Forum Discusses Potential Regulatory Risk |
| 19 | March 14, 2017 | TransDigm: Former Managers at Subsidiaries Explain that Channel Stuffing Was a Strategy to Meet Revenue Goals | TransDign Drops 1.9% on Another Capitol Forum Article |
| 20 | March 15, 2017 | Walgreens/Rite Aid: Bureau of Competition, Economics Staff Remain Skeptical of Fred's Suitability; Walgreens Prepares for Commission-level Arguments | FTC Staff Said to Have Issues With Rite Aid/WBA: Capitol Forum |

| 21 | April 7, 2017 | Walgreens/Rite Aid: Walgreens Floats Plan to Transfer Up to 100 Rite Aid Employees, Divest Close to 1,200 Stores to Fred's; Dollar Store Divestiture Failure Provides Ammunition to Deal Skeptics | Walgreens Said Mulling Sale of 1,200 Stores to FRED: Cap Forum |
| 22 | April 26, 2017 | Snap-on: A Close Look at Snap-on's Relationship with its Franchisees and the Challenges Franchisees Face | Snap-On Drops After Capitol Forum Article Published |
| 23 | May 15, 2017 | Bayer/Monsanto: DOJ Staff Concerned Merger Would Limit Competition in Vegetable Seeds | DOJ Said Concerned on MON/Bayer Vegetable Seed Overlap: Cap Forum |
| 24 | May 24, 2017 | Sinclair/Tribune: Court Challenge to FCC UHF Discount Reinstatement, Potential D.C. Circuit Stay, Creates Timing, Outcome Risk | Risks to TRCO/SBGI Posed by Possible UHF Stay: Capitol Forum |
| 25 | May 31, 2017 | Bayer/Monsanto: Limited Potential Buyer Pool for Liberty and LibertyLink Assets Creates Uncertainty; Divestiture Unlikely to Resolve Concerns About Innovation | Limited Buyers for Bayer Glufosinate Assets: Capitol Forum |
| 26 | June 22, 2017 | Walgreens/Rite Aid: In Face of Unanimous Staff, Front Office Opposition, FTC Commissioners Set to Vote Next Week | FTC Said Set to Vote on RAD/WBA Next Week: Capitol Forum |
| 27 | July 6, 2017 | AT&T/Time Warner: DOJ Staff Focus on Coordinated Effects Theories, Potential Post-Merger AT&T/Comcast Coordination | DOJ Is Said to Be Heavily Staffed for TWX/T Review: Cap Forum |
| 28 | July 17, 2017 | Vantiv: A Close Look at Interchange Billing Practices; Practices Likely Limit Merchants' Ability to Identify How Much They Are Changed | Vantiv Sinks as Capitol Forum Calls Billing Practices Deceptive |
| 29 | July 17, 2017 | Stamps.com: Stamps.com Shipping Options Recently Removed from Amazon Buy Shipping Services | Stamps.com Down; Capitol Forum Says Removed From Amazon Service |

| 30 | July 19, 2017 | AT&T/Time Warner: DOJ Staff Soliciting Recommendations on Potential Conditions; Critics Propose Programming, Zero Rating, Throttling Remedies While Pushing Lawsuit | CORRECT: DOJ Staff Said to Solicit Ideas on TWX/T: Capitol Forum |
|---|---|---|---|
| 31 | July 20, 2017 | Nutrisystem: A Closer Look at Price and Discount Advertising; Certain Practices May Violate State Laws; State and City Attorneys Have Shown Willingness to Enforce State Laws in These Areas | Nutrisystem Falls on Cautious Mention by Capitol Forum (1) |
| 32 | July 21, 2017 | L3 Technologies: Congressmen Send Letter to DoD IG Requesting Investigation into Possible Collusion and Revolving Door Between L3 Technologies and Big Safari | L3 Drops; Capitol Forum Report on Probe Request Circulates (1) |
| 33 | July 28, 2017 | ServiceMaster: A Closer Look at American Home Shield's Business Practices and Legal and Regulatory Risks | ServiceMaster Mentioned Cautiously by Capitol Forum (1) |
| 34 | July 31, 2017 | Vantiv: Company's Claim That It Does Not Mark Up Interchange Fees May Have Violated Securities Law | Vantiv Mentioned Cautiously Again in Capitol Forum Report |
| 35 | August 11, 2017 | Liberty Interactive/HSN: Product Market, Competitive Effects Questions Loom as Key Issues; Second Request Possible | Liberty Interactive/HSN May Get Second Request: Capitol Forum |
| 36 | August 17, 2017 | Bayer/Monsanto: DOJ Preparing to Depose Bayer, Monsanto Executives | Monsanto Down; Cap Forum Says DOJ Preparing to Depose Executives |
| 37 | August 22, 2017 | Fresenius/NxStage: Hemodialysis Machine Overlap, Negative Customer Reaction, Lack of Clear Fix, Drive Antitrust Risk | NxStage Drops After Capitol Forum Discusses Antitrust Risks |
| 38 | August 24, 2017 | Stamps.com: Parcel Partners Sends Email to Partners Regarding Changes to USPS Reseller Model; Email States Parcel Partners Knew Reseller Model Would be Changing and Parcel Partners | Stamps.com May Soon See Changes to USPS Resellers: Capitol Forum |

|    |                    | Provided Partners with Insight into Changes in April |                                                                              |
|----|--------------------|------------------------------------------------------|------------------------------------------------------------------------------|
| 39 | September 7, 2017   | MiMedx: VA Office of Inspector General Confirms Investigation Involving MiMedx Documents | CORRECT: Mimedx Drops, Cap Forum Says Veteran Affairs Probing |
| 40 | September 12, 2017  | Walgreens/Rite Aid: Downsized Deal Raises Questions that Could Spawn Second Request, Sources Say | Walgreens/Rite Aid Review May Be Extended, Capitol Forum Says |
| 41 | October 23, 2017    | Bayer/Monsanto: DOJ Staff Concerned About Merged Company's Position in Digital Farming Software; Structural Remedy Unlikely | DOJ Staff Concerned About MON/Bayer Digital Farming: Cap Forum (October 24, 2017) |
| 42 | December 1, 2017    | Antitrust Policy: AT&T/Time Warner's Impact on Future Vertical Deals; Outlook for Key Transactions Including Bayer/Monsanto, Discovery/Scripps, and Fox/Sky | NxStage/Fresenius Spread Widens Amid Capitol Forum Report |
| 43 | December 4, 2017    | Health Insurance Innovations: A Close Look at Relationship with Third-Party Call Centers; Company Could Potentially Be Held Liable for Actions of Centers | Health Insurance Innovations Slides on Capitol Forum Report |
| 44 | December 7, 2017    | L3 Technologies: Defense Criminal Investigative Services Examining Allegations Related to Big Safari Program | L-3 Drops After Capitol Forum Discusses DOD Big Safari Probe |
| 45 | December 18, 2017   | NIC: A Close Look at Potential Outcomes for Texas.gov Contract; Company Faces National Headwinds for Portal Business Going Forward | NIC Hits Session Lows After Cautious Mention by Capitol Forum |
| 46 | January 11, 2018    | Fresenius/NxStage: NxStage Public Filings, Statements Raise Peritoneal Dialysis Market Actual Potential Competition Questions | FTC Staff Probing Peritoneal Dialysis in NxStage Deal: Cap Forum |
| 47 | January 19, 2018    | Bayer/Monsanto: Bayer, BASF, DOJ Staff in End Stages of Negotiating Divestiture Deal | Monsanto Up; BASF, Bayer in End Stages of DOJ Deal: Cap Forum |

|  |  |  |  |
|---|---|---|---|
| 48 | February 5, 2018 | CDK/R&R: FTC Considering Legal Action Against CDK, R&R for Anti-Competitive Conduct | CDK Global May See FTC Legal Action, Capitol Forum Says |
| 49 | February 22, 2018 | Sinclair/Tribune: Broadcaster's Negotiations with DOJ Staff Hit Snag Over Proposed Remedy | Sinclair's Tribune Is Said to Hit Snag W/ DoJ: Cap Forum |
| 50 | March 8, 2018 | L3 Technologies: DoD Investigators Decline to Pursue Criminal Charges in Big Safari Probe | DoD Won't Pursue Charges in L-3 Probe: Capitol Forum (Earlier) |
| 51 | May 22, 2018 | General Cable: DOJ Investigating Potential FCPA Violations; Implications for Prysmian Acquisition Unclear | General Cable Down on Report of DOJ Probing Possible FCPA Issues |
| 52 | June 22, 2018 | ZTE: CFIUS Expansion Could Be Part of Compromise on ZTE Penalties, House GOP Lawmaker Says | CFIUS Expansion May Be Part of ZTE House Compromise: Cap Forum |
| 53 | July 30, 2018 | USPS Policy: U.S. Will Seek to Eliminate ePacket Mail Category, U.S. Official Says; Policy Change Would Benefit Domestic Retailers, Hurt Companies like Wish, Shopify | Shopify Falls; U.S. Is Said to Be Seeking to Eliminate ePackets |
| 54 | September 11, 2018 | United Technologies/Rockwell Collins: As Consent Negotiations Enter Final Stages, DOJ Clearance Likely This Month | COL/UTX's DOJ Nod Likely in Sept., Cap Forum Says Citing Sources |
| 55 | September 21, 2018 | WestRock/KapStone: Kraft Paper and Containerboard Overlaps, Geographic Market Questions Drive Packaging Tie-Up Antitrust Risk | KapStone Spread Wider as Capitol Forum Highlights Antitrust Risk |
| 56 | October 15, 2018 | Praxair/Linde: Despite Staff Recommendations, Federal Trade Commissioners Continue to Question Ability of Messer/CVS Capital Partners Joint Venture to Fully Restore Competition | PX/Linde Getting Scrutiny From FTC Commissioners: Capitol Forum |
| 57 | October 21, 2018 | Praxair/Linde: Conclusion of Vote Expected Monday; Hoffman Recused | Linde/Praxair Expected to Be Approved by FTC |

| | | | Today: Cap Forum (October 22, 2018) |
|---|---|---|---|
| 58 | November 5, 2018 | KLA-Tencor/Orbotech: SAMR Opens Phase III Review of Semiconductor Tie-Up | Orbotech/KLA-Tencor Gets Phase 3 Probe in China: Capitol Forum |
| 59 | November 9, 2018 | Disney/Fox: SAMR's Phase II Review Slated to Conclude Late This Month | Fox/DIS China Phase II Review Slated to End in Nov.: Cap Forum |
| 60 | November 13, 2018 | Lumentum/Oclaro: SAMR's Phase II Review Set to Conclude This Week | ZTE Has No Objections to Lumentum/Oclaro Deal: Capitol Forum |
| 61 | November 20, 2018 | Tronox/Cristal: FTC Market Tests Proposed Ineos Remedy, Boosting Settlement Prospects | FTC Market Testing New Remedy for Tronox/Cristal: Capitol Forum |
| 62 | November 30, 2018 | Fresenius/NxStage: Dialysis Tie-Up Faces Renewed FTC Vertical Questions | NxStage/Fresenius Getting Renewed Questions From FTC: Cap Forum |
| 63 | December 20, 2018 | IBM/Red Hat: Enterprise Middleware Overlap Looms as Key Horizontal Issue in $34 Billion Tech Tie-Up | Regulators May Scrutinize RHT/IBM Middleware Overlap: Cap Forum |

**Table II**

|   | Date of Publication | Title of Capitol Forum Report | Title of Infringing Bloomberg Work |
|---|---|---|---|
| 1 | June 16, 2016 | Globalstar: Commissioners' Offices in Active Negotiations Over Globalstar Order; Google and Public Interest Groups Back Public-Interest Compromise on Channel 14 | Globalstar TLPS Order Still in FCC Negotiations: Capitol Forum |
| 2 | October 7, 2016 | Danone/WhiteWave: Substantial Public Interest, Dairy Producer Group Opposition, Monopoly and Monopsony Issues Create Timing, Outcome Uncertainty | WWAV/Danone Faces Strong Opposition From Dairy Groups: Cap Forum |
| 3 | November 1, 2016 | Microsoft/LinkedIn: Commission's Focus on Big Data, Potential EDPS Involvement Poses Deal Risk from Competition, Data Protection Standpoints | LNKD/MSFT May See Objections From EU Data Supervisor: Cap Forum |
| 4 | December 29, 2016 | Walgreens/Rite Aid: FTC Market-Testing Divestiture Package; Buyer Leverage, Haggen Parallels Represent Key Issues | FRED Debt, Haggen Parallels Key Issues in RAD/WBA: Capitol Forum |
| 5 | March 7, 2017 | Gov Contracts Weekly: DLA Evaluating Transdigm Subsidiaries' Disclosures; A Closer Look at Impact of USCIS Premium Processing Suspension; Spark Issues Response To NYPSC Order To Show Cause | TransDigm Falls 5.4% as Capitol Forum Says DLA Evaluating Units |
| 6 | March 8, 2017 | Walgreens/Rite Aid: Resolution Unlikely in Near-Term; Closer Look at Commission-Level, State AG Risk | RAD/WBA Resolution Unlikely in Near-Term: Capitol Forum |
| 7 | April 18, 2017 | Government Contracts Weekly: Defense Logistics Agency Says DoD IG Is Investigating TransDigm; Dun & Bradstreet, H-1 B Visas Updates | TransDigm Drops 4% as Capitol Forum Says DOD Reviewing Company |
| 8 | April 19, 2017 | Walgreens/Rite Aid: FTC Lawyers Deposing Walgreens, Rite Aid | Rite Aid Down as Cap Forum Says FTC |

| | | Executives, Making Other Preparations to Litigate | Prepares to Stop WBA Deal |
|---|---|---|---|
| 9 | May 16, 2017 | Government Contracts Weekly: Source Indicates USPS Seriously Looking at Reseller Program; DoD Nominee Supports Full Pentagon Audit; Agriculture Stakeholders Protest DUNS Mandate; Globalstar Sale Rumors | Stamps.Com Falls After Another Capitol Forum Mention |
| 10 | June 8, 2017 | Bass Pro Shops/Cabela's: Deal Clears Major Hurdle as FTC Staff Moves Beyond Price and Promotional Interaction Theories; Timing, Commission Dynamics Positive for Eventual Clearance | Cabela's Up; Cap Forum Says FTC Review Not Raising Staff Concern |
| 11 | June 9, 2017 | Walgreens/Rite Aid: FTC Staff Prepares Recommendation to Sue to Block Merger; Divestiture Talks Fail to Yield Breakthrough So Far | FTC Staff Said Preparing Advice to Block WBA/RAD: Capitol Forum |
| 12 | June 29, 2017 | Bass Pro Shops/Cabela's: FTC Staff Recommends Transaction's Unconditional Clearance | FTC Staff Said to Recommend Approval of CAB/Bass Pro: Cap Forum |
| 13 | August 11, 2017 | Amazon/Whole Foods: FTC Staff Examining Potential Impact of Lost Home-Delivery Competition Between Companies | FTC Probing Home Delivery Competition in WFM/AMZN: Capitol Forum |
| 14 | September 15, 2017 | Walgreens/Rite Aid: FTC Staff Recommends Clearing Revised Walgreens/Rite Aid Deal, Sources Say | FTC Staff Is Said to Recommend Revised Walgreens Deal: Cap Forum |
| 15 | October 9, 2017 | AT&T/Time Warner: DOJ Negotiations Focus on Protections for Video Distribution Rivals, But Deal Critics Press for Content Safeguards; Review Slows After Delrahim Confirmation | TWX/T Review Said to Slow as Delrahim Arrives at DOJ: Cap. Forum |
| 16 | October 11, 2017 | TransDigm: DOJ Antitrust Division Investigation TransDigm's Takata, Schroth Acquisitions; Review Could | TransDigm Down; Cap Forum Says DOJ is Said to Probe Schroth Deal |

| | | Drive Divestiture, Notification Remedies | |
|---|---|---|---|
| 17 | November 1, 2017 | AT&T/Time Warner: AAG Delrahim Probes Deal's Antitrust Issues, Likely Delaying Resolution Until Around Thanksgiving | DOJ Ruling on TWX/AT&T Is Said Delayed to Late Nov.: Cap Forum |
| 18 | November 16, 2017 | AT&T/Time Warner: As Sides Show No Signs of Nearing Settlement, Delrahim Issues Biting Critique of Behavioral Remedies | TWX/T Are Said to Show No Signs of DOJ Settlement: Cap Forum |
| 19 | December 20, 2017 | Bayer/Monsanto: DOJ Staff Seeks Statements from industry Participants Detailing Seed Sector Complaints | MON/Bayer Review at DOJ Said to Seek Farmers' Views: Cap. Forum |
| 20 | January 29, 2018 | AltaGas/WGL: Companies Not Addressing D.C. Concerns, City Negotiator Says | D.C. Official Says WGL/Altagas Not Addressing Issues: Cap Forum |
| 21 | February 6, 2018 | USPS Policy: Amazon Approaching Multi-Carrier Shipping Software Platforms to Add Amazon as a Shipping Carrier Option Before the End of 2018 | Amazon Eyeing Move Into Parcel Delivery Service: Capitol Forum |
| 22 | March 9, 2018 | Bayer/Monsanto: EC Conditional Clearance Set for March 21, Negotiations with DOJ Continue | EC Is Said on Track to Approve MON/Bayer March 21: Cap Forum |
| 23 | April 11, 2018 | Health Insurance Innovations: HCC California Settlement Has No Bearing on Ongoing Multi-State Examination According to Two State Insurance Regulators; HCC Agrees to End Sale of Short-Term Medical Insurance in Settling States | HCC Settlement Has No Bearing on HIIQ Inquiry: Capitol Forum |
| 24 | May 2, 2018 | Northrop Grumman/Orbital ATK: DOD Leans Toward Recommending Deal's Conditional Approval | DoD Leaning in Favor of FTC Approval of Orbital/NOC: Cap Forum |

| 25 | May 23, 2018 | General Cable Update: DOJ Public Affairs Clarifies that DOJ is Not Investigating General Cable for New Misconduct | General Cable Gains on Report Not Being Probed by DOJ |
|----|----|----|----|
| 26 | June 27, 2018 | ZTE: Senate Defense Chairman Signals GOP Moving Toward Trump View on ZTE | GOP Seen Moving Toward Trump's ZTE View, Capitol Forum Says (June 28, 2018) |
| 27 | July 20, 2018 | Qualcomm/NXP: As Deal End Date Approaches, SAMR Decision Poised for Key Impact on U.S.-China Trade, Telecom Tensions | NXPI/QCOM Talks with China Antitrust Slowed This Week: Cap Forum |
| 28 | August 3, 2018 | CVS Health/Aetna: Companies' Medicare Part D Overlap Draws DOJ Concern, Sparks Divestiture Discussions | CVS/Aetna Medicare Part D Overlap Draws DOJ Concern: Cap Forum |
| 29 | August 8, 2018 | United Technologies/Rockwell Collins: SAMR Assesses Proposed Structural, Behavioral Remedies as Review Enters Final Stages | Rockwell/UTX Is Said in Final Stages of China Review: Cap Forum |
| 30 | September 19, 2018 | NIC INC: Colorado Amending and Extending Portal Contract with NIC | NIC Inc. Is Said to Win Colorado Extension: Cap Forum (Sept. 19) (September 20, 2018) |
| 31 | September 10, 2018 | Praxair/Linde: China's Review likely to Take Longer Than Companies Expected as SAMR Conducts Surveys, Weighs Remedy Proposals | Linde/PX China Review Longer Than Expected: Cap Forum (Sept. 10) (September 11, 2018) |
| 32 | September 25, 2018 | PolarityTE: FDA Form 483 Raises Issues with SkinTE Processing and Operations | PolarityTE Falls on Report Company Received FDA Form 483 (2) (September 26, 2018) |
| 33 | September 26, 2018 | Trupanion: New York DFS Clarifies FOIL Response, Denies Investigation Into Trupanion | Trupanion Confirms Lack of N.Y. DFS Probe; Shares Off Lows (2) |

| 34 | September 27, 2018 | SAMR Policy: China Mobile Faces Antitrust Inquiry, Signaling SAMR's First Probe Into State-Owned Telecom Giant | China Mobile Under Investigation by China Antitrust: Cap Forum |
|---|---|---|---|
| 35 | September 28, 2018 | KLA-Tencor/Orbotech: SAMR Conducting Phase II Review of Proposed Semiconductor Industry Tie-Up | Orbotech/KLA-Tencor Under Phase 2 Review in China: Capitol Forum |
| 36 | October 12, 2018 | United Technologies/Rockwell Collins: SAMR Staff Recommends Clearance With Fix; SAMR Vice Minister Now Considering Deal's Fate | SAMR Staff Recommend COL/UTX Conditional Approval: Capitol Forum |
| 37 | November 9, 2018 | Amcor/Bemis: Flexible Medical Packaging Overlaps Draw DOJ Scrutiny | Amcor's Buy of Bemis Drawing DOJ Scrutiny, Capitol Forum Says |
| 38 | March 21, 2019 | UnitedHealth/DaVita: Commissioners Delay Vote After Bureau of Competition Recommends Litigation, Bureau of Economics Expresses Reservations About Potential Court Fight | Davita Gains After Capitol Forum Says FTC Vote on UNH Delayed |
| 39 | April 3, 2019 | SAMR Policy: Tencent Music Faces Antitrust Scrutiny in China Over Abuse of Dominance Concerns | Tencent Music Pares Gain Amid Report of Chinese Antitrust Probe |
| 40 | June 7, 2019 | UnitedHealth/DaVita: FTC Bureau of Competition Staff Finalizes Settlement Recommendation; Colorado AG Concerns Linger | DaVita Gains on Report FTC Staff Nearing Approving UNH Unit Deal |